LaShawn JOHNSON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2009–SC–000401–MR.

Supreme Court of Kentucky.

Dec. 16, 2010.

Daniel T. Goyette, Louisville Metro Public Defender, Bruce P. Hackett, Chief Appellate Defender, Office of the Louisville Metro Public Defender, Louisville, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, James Coleman Shackelford, Assistant Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

LaShawn Johnson appeals as a matter of right [1] from a judgment convicting him of first-degree robbery, first-degree burglary, and of being a first-degree persistent felony offender (PFO). Johnson was sentenced to twenty-five years' imprisonment. He contends on appeal that the judgment must be reversed because the trial court refused to instruct the jury on second-degree robbery and second-degree burglary and that his case must be remanded for an evidentiary hearing on his motion to suppress DNA evidence, alleging that a sample or profile of his DNA had been illegally entered into the CODIS (Combined DNA Index System) database. We disagree with all of Johnson's contentions on appeal, and affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL HISTORY.

In the light most favorable to the verdict, the relevant facts are as follows. Around midnight, the victim woke up in his apartment and discovered that an intruder was in his kitchen. The intruder pointed a gun at the victim and ordered him to lie on the floor. The intruder then ordered the victim to give him money. Once the victim remembered that he had lost his wallet, the victim offered the intruder his car keys instead. Fearing that the intruder would not be satisfied with car keys and would not leave, the victim then grabbed the intruder and the two wrestled. The intruder struck the victim with the gun, and the gun was knocked out of the intruder's hands. The victim kicked the gun under the couch, and pulled the intruder toward the door, which the victim unlocked with a key. The victim later recalled the intruder saying "I just want

my piece and then I'll leave" and assumed that "piece" meant the gun. After opening the door, the victim fled, spraining his ankle on the stairs.

Shortly after the victim escaped the apartment, another man saw him dressed only in boxer shorts, standing on a nearby street corner, acting erratically, and waving at cars before collapsing. The man also recalled that the victim appeared to have been "pummeled by a blunt object" and that the victim's face and feet were bleeding. After the victim told the man what happened, the man called police and offered to get some clothing for the victim to wear. The victim refused the offer of clothing until police arrived because he feared the intruder would return. The man stated that the victim looked terrified and started vomiting, possibly from fear or pain.

Police arrived and spoke briefly with the victim. One police detective later testified that the victim appeared to be "in shock," bewildered, and obviously beaten. Although the victim was too shaken at that point to talk at length, he told police that the crime happened at his home and gave a general description of the intruder as a dark-skinned African American male with a narrow face, wearing dark clothes and an unusual hat and carrying a gun. The victim later described the gun in his trial testimony as a black gun with a square handle and square barrel and characterized it as a handgun.

After speaking briefly with police at the scene, the victim was transported to a hospital by ambulance. At the hospital, an MRI of the victim's facial area appeared normal, but he was treated for a sprained ankle and given a pair of crutches, which he used for several weeks. He also re-

1. Ky. Const. § 110(2)(b).

called in his trial testimony that he had a small "break" in a bone in his leg, although not in his ankle.

When police inspected the victim's apartment, they determined that the intruder had likely entered through a kitchen window. Outside that kitchen window they found a soft drink cup with a straw. The cup was filled with red liquid and coated with condensation, indicating that the ice had not fully melted at the time it was found. The intruder had disappeared by the time police inspected the apartment, and police did not find a gun in the apartment. A few days after the incident, the victim turned a gun clip over to police. He stated that he found the gun clip under his couch. The clip was unloaded, and the investigating detective believed that the clip came from a BB or pellet gun, although he recognized that people often mistook these guns to be real handguns.

Based upon the style of the cup, the investigating detective determined that the cup and straw had come from a gas station or convenience store about a mile from the victim's home. And he found that the gas station's surveillance tape revealed that a man whose appearance matched the description of the intruder given by the victim had bought a red soft drink there shortly before the incident at the victim's apartment. Printing a still photo from the surveillance tape, the detective used it to prepare an attempt-to-locate flyer and showed the flyer to patrol officers at roll call a few days after the incident. One of the patrol officers recognized the man in the still photo as Johnson and gave Johnson's name and other contact information to the investigating detective.

The detective was then able to obtain a photograph of Johnson to use in a photo pack. When he showed the photo pack to the victim, the victim ruled out the other five men pictured and said he was seventy percent sure that Johnson's picture was the picture of the intruder. He indicated in writing that the photo of Johnson "closely resembles" the intruder. The detective then showed the victim the still photo from the surveillance tape on the flyer. The victim later testified to being more certain that this photo on the flyer was the intruder because the man in the flyer photo had the same unusual clothing, distinctive hat, and slight build he remembered the intruder having.

After he was arrested, Johnson admitted that he was the man on the gas station's surveillance tape. He denied committing the burglary and robbery. Johnson did not testify at the trial.

The victim identified Johnson as the intruder at trial and testified that he was certain of the identification. He also testified that the room where he had first encountered the intruder was illuminated well, and he stated that he had seen the intruder's face for five to ten seconds.

In addition to seeking the victim's identification of the intruder, police had also collected as potential evidence the cup, lid, and straw found outside the victim's window. These items did not yield any fingerprints, but they were sent to the Kentucky State Police laboratory for DNA analysis. A DNA analyst tested the straw, and obtained a DNA profile from it. The DNA profile was entered on CODIS, and a database search revealed that this DNA profile matched a DNA profile from a "forensic unknown" semen sample collected from the underpants of an alleged rape victim who had accused Johnson of rape a few years earlier.

Police filed an affidavit requesting a buccal swab[2] from Johnson, citing evidence of

---

**2.** A buccal swab is apparently taken from the inside of a person's cheek.

identification (but not referring to the CO-DIS match) and obtained the necessary search warrant. The DNA sample collected from Johnson via buccal swab matched the DNA profile on the straw at all loci. Johnson was indicted for first-degree burglary and first-degree robbery, and the case proceeded to trial.

Johnson moved pretrial to suppress all DNA evidence, claiming that his DNA profile had been illegally entered into CODIS and that other DNA evidence would not have been obtained without the alleged illegal entry of his DNA profile on CODIS. The trial court denied this motion to suppress. Counsel for Johnson then moved that reference to samples on CODIS for other alleged crimes be excluded, and the trial court granted the motion to exclude DNA and other evidence of other alleged crimes.

Following the presentation of evidence, Johnson argued that the jury should receive instructions on the lesser-included offenses of second-degree robbery and second-degree burglary. The trial court refused to instruct on these lesser-included offenses. After the charges of first-degree robbery and first-degree burglary were submitted to the jury on the trial court's instructions, the jury returned verdicts of guilty on both charges. During the penalty phase, the jury recommended a sentence of fifteen years' imprisonment on each conviction, but then recommended enhancing each sentence to twenty-five years' imprisonment upon finding him guilty of being a first-degree PFO. The jury further recommended that the sentences be served concurrently, and the trial court entered judgment accordingly.

## II. ANALYSIS.

### A. Trial Court Did Not Err in Refusing to Give Instructions on Second–Degree Burglary and Second–Degree Robbery.

■ The trial court instructed the jury on the elements of first-degree robbery and first-degree burglary with language closely tracking the statutes defining these offenses. Johnson does not fault the trial court's instructions on these offenses. But Johnson contends that the trial court committed reversible error in denying his request for instructions on the lesser-included offenses of second-degree robbery and second-degree burglary. Although Johnson tendered written instructions defining these two lesser-included offenses, and the trial court clearly stated on the record that it would not instruct the jury on these lesser-included offenses, the trial court did not explain why it denied the request to instruct on second-degree robbery and second-degree burglary.[3] We believe that the trial court properly denied instructions on these lesser-included offenses because these requested instructions were not warranted by the evidence, especially the overwhelming and uncontradicted evidence that the intruder caused the victim physical injury.

A person is guilty of second-degree robbery when "in the course of committing theft, he uses or threatens the immediate use of physical force upon another person

---

3. It is possible that the trial court explained its reasons for denying the request in some portion of the record that has not been cited to us, but the trial court simply stated that it was denying Johnson's request for instructions on second-degree burglary and second-degree robbery without offering an explanation in the portion of the record cited in briefs. We decline to undertake to ferret out the trial court's rationale by sifting through the entire record in a possibly vain attempt to learn the trial court's rationale for denying the requested instructions on lesser-included offenses.

with intent to accomplish the theft."[4] A person is guilty of first-degree robbery when the elements of second-degree robbery are met and the prosecution proves that either the perpetrator:

(1) is armed with a deadly weapon,

(2) uses or threatens immediate use of a dangerous instrument, or

(3) causes physical injury to the victim.[5]

Similarly, a person is guilty of second-degree burglary when "with the intent to commit a crime, he knowingly enters or remains unlawfully in a dwelling"[6] but he is only guilty of first-degree burglary if, in addition to proving the elements of second-degree burglary, the prosecution shows that either:

(1) he is armed with a deadly weapon or explosives,[7]

(2) he uses or threatens immediate use of a dangerous instrument, or

(3) he causes the victim physical injury.[8]

Johnson argues that because the gun clip found did not contain BBs or pellets and because there was no proof that the intruder's BB or pellet gun was operable, the jury could have had a reasonable doubt that he was armed with a deadly weapon. Because the jury could have a reasonable doubt that he was armed with a deadly weapon, he argues that a jury could have reasonably found beyond a reasonable doubt that he was guilty of second-degree burglary and second-degree robbery, while harboring a reasonable doubt of his guilt on first-degree burglary and first-degree robbery charges. So he contends he was entitled to an instruction on second-degree robbery and second-degree burglary.

Johnson's argument focuses on whether the jury could have a reasonable doubt about his being armed with a deadly weapon, but we note that even if the jury had a reasonable doubt about his being armed with a deadly weapon, the jury could have find him guilty of first-degree robbery and first-degree burglary if the jury was convinced beyond a reasonable doubt of either of two other alternative theories: (1) the actual or threatened use of a dangerous instrument, or (2) causing physical injury to the victim in the course of robbing and burglarizing the victim. And there is evidence to support convictions for first-degree robbery and first-degree burglary on any of these three alternate theories,[9] despite Johnson's argument that an apparent lack of affirmative evidence that the BB or pellet gun was loaded or operable[10] should

---

4. Kentucky Revised Statutes (KRS) 515.030(1).

5. KRS 515.020(1).

6. KRS 511.030(1).

7. No one alleged that the intruder was armed with explosives. Therefore, the trial court properly did not ask the jury to consider whether Johnson was armed with explosives, but rather simply asked whether he was armed with a deadly weapon, used or threatened use of a dangerous instrument, or caused physical injury to the victim as part of its first-degree robbery instruction.

8. KRS 511.020(1).

9. Johnson does not appear to argue that there was no evidence to support a finding of either physically injuring the victim or using or threatening the immediate use of a dangerous instrument. And because we conclude that a reasonable jury could consider a BB or pellet gun to be a deadly weapon, logically a reasonable jury could also consider a BB or pellet gun to be a dangerous instrument. See KRS 500.080(3) (defining *dangerous instrument* as an instrument "readily capable of causing death or serious physical injury"); KRS 500.080(4)(b) (defining *deadly weapon* as including a weapon "from which a shot, readily capable of producing death or other serious physical injury, may be discharged").

10. Johnson points to the fact that the gun clip or magazine was empty when found; however, possibly the intruder could have emptied it after the victim fled or perhaps the gun clip

defeat a finding that the weapon was a deadly weapon.

■ Johnson is correct that a deadly weapon is statutorily defined as including a weapon "from which a shot, readily capable of producing death or other serious physical injury, may be discharged...." [11] But we have not construed this statutory definition to require proof that the individual weapon was loaded and operable; more accurately, a plurality of this Court has construed this definition as only requiring proof that the weapon was of a class of weapons "from which a shot, readily capable of producing death or other serious physical injury, may be discharged ...." [12] and a majority of this Court has clearly held that whether the individual weapon was loaded or operable is not determinative.[13] And while Johnson correctly and successfully argued to the trial court that whether the weapon was a deadly weapon was a question of fact that should be submitted to the jury to decide,[14] a jury could reasonably determine that a pellet or BB gun was a deadly weapon (i.e. a type of weapon from which a shot could cause death or serious physical injury) in light of history of serious physical injuries caused by BB or pellet guns.[15]

---

or magazine found did not even come from the same gun carried by the intruder during the burglary and robbery. He also points to the lack of affirmative evidence that the pellet or BB gun, which was never found, was operable.

11. KRS 500.080(4)(b).

12. *Wilburn v. Commonwealth*, 312 S.W.3d 321, 328–329 (Ky.2010). While only three members of this Court fully concurred with the opinion setting forth the above construction of the statute, a majority of this Court appeared to accept the *Wilburn* plurality's construction of this statute in the recent unpublished cases of *Smith v. Commonwealth*, No. 2009–SC–000364–MR, 2010 WL 2471513 at *1 (Ky. June 17, 2010) and *Grider v. Commonwealth*, No. 2009–SC–000187–MR, 2010 WL 2471868 at *3 (Ky. June 17, 2010).

13. *See Wilburn*, 312 S.W.3d at 331–32 (Schroder, J., concurring in result only, joined by Scott, J., and stating disagreement with overruling precedent holding that any object successfully intended to convince the victim it is a deadly weapon could support finding of deadly weapon).

14. *See generally Thacker v. Commonwealth*, 194 S.W.3d 287, 290–91 (Ky.2006). The trial court properly did not declare the pellet or BB gun to be or not to be a deadly weapon as a matter of law. Rather, it instructed the jury on the elements of first-degree robbery and first-degree burglary. It also issued an instruction defining necessary terms for the jury's determination of whether the elements of both crimes were met. Its definition of *deadly weapon* followed the language of KRS 500.080(4)(b): "[a]ny weapon from which a shot, readily capable of producing death or serious physical injury, may be discharged."

15. *See Ware v. Commonwealth*, 34 S.W.3d 383, 385 (Ky.App.2000) (after defendant entered guilty plea to first-degree robbery of store with BB gun, trial court properly determined that defendant was ineligible for probation because BB guns can cause serious physical injury); *Skaggs v. Assad, By and Through Assad*, 712 S.W.2d 947 (Ky.1986) (civil negligence action arising from accidental BB gun shooting; plaintiff lost sight in one eye due to it being hit by pellet from BB gun); *Coffman v. Commonwealth*, No. 2004–CA–002140–MR, 2005 WL 3334356 at *2 (Ky. App. Dec. 9, 2005) (rejecting appellant's argument that victim did not suffer serious physical injury where BB penetrated deep into victim's brain although treatment was simple as this injury could not logically be viewed as one which "did not create a substantial risk of death...."); *State v. Dallen*, 452 N.W.2d 398, 398–99 (Iowa 1990) (trial court erred in finding evidence insufficient to support jury finding that gun which shot BBs or pellets was a "dangerous weapon" given testimony that BB shots could cause death in certain circumstances); *State v. Seifert*, 256 N.W.2d 87, 88 (Minn.1977) (adequate factual basis for guilty plea to aggravated robbery as defendant had been armed with a BB gun, which might qualify as a "dangerous weapon" capable of causing "death or great bodily harm.").

■ Our precedent holds that a defendant is entitled to an instruction on a lesser-included offense only where the jury might have a reasonable doubt as to his guilt of the greater offense but could find him guilty of the lesser offense beyond a reasonable doubt.[16] Here we cannot conclude that a reasonable jury could find Johnson guilty beyond a reasonable doubt of second-degree burglary and second-degree robbery but not guilty of first-degree robbery and first degree burglary because of the overwhelming and uncontradicted evidence of the intruder causing a physical injury to the victim. In other words, a reasonable jury could not have a reasonable doubt that Johnson injured the victim under the facts of this case if it believed that Johnson committed the burglary and robbery. The victim testified to being hit with a gun by the intruder, having a facial injury, and suffering a sprained ankle in fleeing the intruder. The man who helped the victim testified to the victim bleeding from his face and feet, looking like he had been "pummeled" with a blunt object, collapsing at one point, and vomiting from pain or fear. The detective testified to the victim appearing in shock and obviously beaten. And Johnson has not pointed to *any* evidence casting doubt on whether the victim suffered such injuries or whether such injuries were caused by the intruder in the course of the burglary or robbery. So the evidence presented at trial did not warrant instructions on second-degree burglary and second-degree robbery.[17]

Consequently, we affirm the trial court on this issue.

## B. Johnson Not Entitled to Further Relief Due to CODIS Issues.

■ Citing Kentucky Rules of Criminal Procedure (RCr) 9.78,[18] Johnson contends that the case must be remanded to the trial court for an evidentiary hearing on his motion to suppress DNA evidence because of his allegation that his DNA profile was illegally entered into CODIS. Because the trial court conducted a hearing on the motion to suppress and allowed the parties to present evidence and because Johnson failed to present evidence that this DNA profile was illegally entered into CODIS, we do not conclude that he is entitled to another evidentiary hearing upon our review of the record before us and applicable law. Furthermore, the trial court properly denied the motion to suppress because (1) the alleged improper entry into CODIS would only involve a statutory violation and not a constitutional violation and (2) the DNA evidence actually presented at trial was properly gathered in a manner not depending on any improper CODIS entry.

Before trial, Johnson filed a motion to suppress all DNA evidence. In his memo-

---

**16.** *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky.1998) ("An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.").

**17.** Although we take note of Johnson's citation to United State Supreme Court authority highlighting the importance of instructing the jury on lesser-included offenses where appropriate, we also note these authorities qualify the right to instructions on lesser-included offenses to apply only where there is evidence to warrant such instructions. *See Keeble v. United States*, 412 U.S. 205, 208–09, 214, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *Beck v. Alabama*, 447 U.S. 625, 636–37, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**18.** RCr 9.78 provides in pertinent part that the trial court must hold an evidentiary hearing if a criminal defendant makes a pretrial motion to suppress or objects at trial to the admission of "the fruits of a search."

randum supporting this motion, he asserts that S.W. alleged that Johnson had raped her and a sample of his blood was submitted to DNA analysis in 2003,[19] resulting in what Johnson terms a "DNA blood card" for him. But no semen was detected on any portion of the items in the sexual assault evidence collection kit taken from S.W.

In 2004, two other alleged victims (T.H. and C.G.) also accused Johnson of rape, and sexual assault evidence collection kits were obtained from both alleged victims. This time, semen was found on a cutting from C.G.'s underpants. The semen sample was submitted for DNA analysis and compared with Johnson's "DNA blood card" from the investigation of the alleged rape of S.W. in 2003. The Forensic Case Report from this comparison indicated that the DNA profile from Johnson's DNA blood card from 2003 matched the DNA profile obtained from the semen found in the cutting from C.G.'s underpants. But Johnson was apparently never charged with raping C.G.[20]

In 2007, following the incident at issue, police collected the straw, cup and lid found outside the victim's residence and submitted these items for DNA testing. Ultimately only the straw was tested for DNA. A male DNA profile was obtained from the straw. This profile was entered into CODIS to check for possible matches, and the detective received a letter from a database supervisor indicating that there was a match between the DNA on the straw and the DNA profile from the C.G. investigation which had not resulted in charges.

In 2008, the detective filed an affidavit for a search warrant to obtain a buccal swab from Johnson for DNA testing. The affidavit did not mention the match between the DNA profile from the straw in this case and the DNA profile from the semen found in the uncharged C.G. case. And apparently police were also still aware that the DNA profile in the C.G. case matched the DNA sample obtained from Johnson in the earlier S.W. case but the affidavit did not mention any DNA evidence obtained in the S.W. case either.

Johnson contends that the detective's failure to cite the match between the DNA on the straw and the DNA from the semen found in the C.G. case shows that the detective knew that Johnson's profile had been illegally entered into the CODIS database. He contends that any entry of his DNA profile into the CODIS database was illegal because he had never been convicted of an offense that would require that his DNA profile be entered into the CODIS database.[21]

---

19. We are unaware of the circumstances of the collection of a blood sample for DNA testing in the S.W. case. Perhaps Johnson consented to giving a blood sample or perhaps a warrant was issued to collect a blood sample from Johnson. Johnson does not appear to argue that this blood sample was illegally obtained.

20. We do not have a full record of the investigations or any court proceedings regarding the three alleged rapes. Apparently Johnson was never convicted of any rape. It appears that he was never tried on any rape charges. Apparently he was either never charged with all or some of the alleged rapes and/or any rape charges were dismissed.

21. See KRS 17.175 (providing for CODIS database of DNA identification records including those of convicted offenders).

It is not entirely clear when Johnson alleges an illegal CODIS entry was made. It appears that Johnson complains that DNA analyst Bridget Holbrook's posting the DNA profile from the straw on CODIS was illegal. It also appears that he complains that the DNA profile obtained from the semen on C.G.'s underpants was illegally posted on CODIS. He also may be alleging that

The trial court conducted a hearing on the motion before trial. Johnson's counsel contended that Johnson's DNA profile had been illegally entered on CODIS because Johnson did not have the necessary convictions for posting his profile on CODIS. The Commonwealth's attorney argued that Johnson's profile had not been entered into CODIS as a convicted offender, but that all entries were labeled "forensic unknown" DNA samples from crime scene specimens. No evidence was taken at that time, but the parties discussed how perhaps some light might be shed on the issue by taking the deposition of Bridget Holbrook,[22] who performed the DNA testing on the straw and whose notes indicated that the DNA profile collected from the straw would be entered into CODIS and routinely searched. The Commonwealth contends that Johnson could have presented evidence at this hearing but failed to do so.

Holbrook testified by deposition that after obtaining a DNA profile from the straw, she entered the DNA profile from the straw onto CODIS as a "pending forensic unknown" and that following further review by her supervisor, the DNA profile was entered as a "forensic unknown" on state-level and national-level databases which were parts of CODIS. Upon cross-examination by Johnson's counsel, Holbrook testified that a search revealed that there was a match on the DNA profile from the straw. But there appears to have been no further discussion of what other DNA profile or sample matched the DNA profile from the straw from our review of the record. The trial court entered a written order denying the motion to suppress, finding that Johnson's DNA profile had not been entered into CODIS and that the DNA sample from the buccal swab had been properly obtained pursuant to a warrant.

From our review of the record, it appears that later on Johnson moved to exclude DNA evidence from the 2003 and 2004 investigations and this motion was granted. And we are unaware of any DNA evidence from these earlier investigations actually being presented at trial.[23] From our review, it appears that the last few minutes of Holbrook's deposition testimony, in which she indicated that there was a "hit" on the DNA profile from the straw when entered into CODIS, were not played back to the jury. It appears to us that the DNA evidence actually presented at trial consisted of Holbrook's testimony that (1) she obtained a DNA profile from the straw collected at the scene and (2) that this DNA profile matched the DNA

---

the "DNA blood card" obtained from him during the S.W. investigation was posted or that some other DNA profile or sample identified as his was posted on CODIS.

Despite these possible allegations, we are satisfied that the DNA evidence actually presented at trial (the DNA profile obtained from the straw and the DNA sample taken from Johnson via buccal swab) were obtained in a proper manner not depending upon any actual or alleged prior CODIS entries related to the 2003 and 2004 investigations of alleged rapes.

**22.** Holbrook was unavailable to testify during the trial; thus, her deposition was taken in lieu of her testifying at trial. We note that

Holbrook's first name is sometimes spelled as "Bridget" and other times as "Bridgett" in the briefs. Although we do not know which spelling is correct, obviously the parties are referring to the same person.

**23.** Johnson argues that "[t]he use of Johnson's DNA profile generated from a previously obtained biological collection kit in 2003 constitutes a warrantless seizure of his DNA profile in this case." But his DNA profile (or DNA blood card) obtained from the S.W. investigation in 2003 was apparently not mentioned at trial and as explained elsewhere in our opinion, none of the DNA evidence actually presented at trial was obtained in a manner depending upon his 2003 DNA profile.

sample collected from Johnson via buccal swab at all loci. Because we are unaware of any allegations that DNA from the straw was improperly obtained and we are convinced from our review of the record that police properly obtained a warrant to collect the buccal swab for DNA analysis and did not depend upon evidence obtained in an unconstitutional manner in doing so, we do not believe that any DNA evidence actually presented should have been suppressed by the trial court or that any further evidentiary hearing is required on Johnson's motion to suppress.

Kentucky Revised Statutes (KRS) 17.175 provides that the Kentucky State Police shall establish a centralized database of DNA "identification records" including those of convicted offenders and "crime scene specimens" for the purpose of assisting law enforcement with investigating crimes. (KRS 17.170 provides in pertinent part that any DNA sample [24] provided prior to March 27, 2009 shall be "maintained and used" in accordance with KRS 17.175 and KRS 17.510.[25]) The Commonwealth thus argues that different types of entries can be posted on CODIS and acknowledges that posting a person's DNA sample or profile by that person's name is only permitted where the person has been convicted or adjudicated guilty of certain crimes. But it submits that the statutes also authorize the posting of DNA profiles obtained from "crime scene specimens" such as the straw recovered from the crime scene here as well as the alleged victim's underpants in the C.G. case. It contends there was nothing wrong in posting DNA profiles from crime scene specimens as "forensic unknowns."

We believe that the Commonwealth is correct and agree with the trial court that it does not appear that the statutes regarding CODIS were violated here, especially because Johnson has failed to come forth with any evidence that any DNA profile identified as his was posted on CODIS prior to his trial on robbery and burglary charges. Even if such had occurred, this would amount to at most a statutory violation and not a constitutional violation and, thus, would not entitle him to suppression.[26]

 The most pertinent question here is not necessarily whether anything was improperly posted on CODIS, but whether the DNA evidence presented at trial was illegally obtained. Obviously the taking of biological samples from a person is a search, and generally a warrant is required to take such samples from a person absent a valid exception to the warrant requirement such as exigent circumstances or consent.[27] But here Johnson does not

---

**24.** As the Commonwealth points out, a *DNA sample* is statutorily defined as "a *blood or swab specimen* from a person, as prescribed by administrative regulation, that is required to provide a DNA sample pursuant to KRS 17.170 or 17.510, that shall be submitted to the Department of Kentucky State Police forensic laboratory for law enforcement identification purposes and inclusion in law enforcement identification databases...." KRS 17.169(1) (emphasis added). In other words, a *DNA sample* refers to a "blood or swab specimen" from a person statutorily required to provide such a DNA sample and would not refer to a DNA profile obtained from a "crime scene specimen" such as the straw recovered from the crime scene here.

**25.** KRS 17.510 deals with sex offender registration.

**26.** *See, e.g., Saylor v. Commonwealth,* 144 S.W.3d 812, 817 (Ky.2004) (holding that exclusionary rule only requires exclusion of evidence obtained in violation of constitutional rights and that exclusion of evidence obtained in violation of statutory rights is not necessarily required).

**27.** *See generally Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908

allege any impropriety in submitting the straw for DNA analysis, and a warrant issued to take a buccal swab from him for DNA analysis.

Despite Johnson's arguments that the warrant to take the buccal swab somehow stemmed from an illegal entry of his DNA sample or profile onto CODIS and that all DNA evidence should have thus been suppressed as "fruit of a poisonous tree," we agree with the trial court that the warrant was properly issued. The affidavit for a warrant to obtain a buccal swab did not mention any CODIS entries, but simply stated that DNA had been found on the straw found at the crime scene and pointed to other evidence establishing probable cause that Johnson committed the alleged burglary and robbery.

The affidavit for the search warrant recounted the detective's finding the convenience store where the cup with red liquid came from and finding footage of a man matching the victim's description of the intruder buying a cup with red liquid on the store's surveillance tape, a police officer's identification of Johnson as the man shown in the still photo from the convenience store surveillance tape, and the victim's eliminating all other photos in the photo pack and stating that Johnson's photo "closely resembles" the man who robbed the victim. Regardless of the detective's motivation for not mentioning any CODIS entries or matches, a judge properly determined that probable cause existed to justify the search based upon the other aforementioned evidence [28] and not based on any prior CODIS entries or matches. So we discern no reason to exclude the DNA evidence presented at trial because it was not obtained in an unconstitutional manner, and we affirm the trial court on this issue as well.

### III. CONCLUSION.

For the foregoing reasons, the trial court's judgment is hereby affirmed.

All sitting. All concur.

---

(1966); *Holbrook v. Knopf,* 847 S.W.2d 52 (Ky.1993).

**28.** Because the police already had a strong independent basis for identifying Johnson as the perpetrator (including an officer's recognizing him as the man in the still photo from the convenience store surveillance), any information on CODIS which might be used to identify Johnson as the perpetrator here would be of merely cumulative effect.