**Joseph WILSON, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2012–SC–000474–MR.**

Supreme Court of Kentucky.

Aug. 21, 2014.

30. *Id.*

Molly Mattingly, Assistant Public Advocate, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, Gregory C. Fuchs, Assistant Attorney General, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Joseph Wilson appeals as a matter of right from a judgment of the Jessamine Circuit Court sentencing him to twenty-five years in prison for first-degree burglary, three counts of theft by unlawful taking of a firearm (principal or accomplice), and one count of theft by unlawful taking of property valued at $500.00 or more (principal or accomplice). Wilson raises eight issues on appeal, the first being that his convictions on three separate counts of theft by unlawful taking of a firearm violated Double Jeopardy. He also alleges that the trial court erred (1) by allowing a witness to offer hearsay evidence concerning the value of the stolen items; (2) in denying a directed verdict on the first-degree burglary charge; (3) by allowing admission of a recorded phone conversation undisclosed to defense counsel; (4) by admitting evidence relating to domestic violence orders entered against him; and (5) by admitting evidence of Wilson's alleged "flights" from law enforcement officers. Wilson further alleges the Commonwealth committed numerous *Moss* violations during examination of a critical witness and engaged in prosecutorial misconduct during closing argument. Having reviewed the record, we reverse the judgment of the Jessamine Circuit Court and remand for further proceedings.

## FACTS

Upon returning to his Nicholasville, Kentucky home around noon on August 31, 2010, Brian Stephens encountered a green sports utility vehicle ("SUV") traveling down his driveway at a high rate of speed. Stephens observed two individuals in the SUV as he attempted to block its path with his truck. The SUV drove around Stephens's truck and through a drainage ditch before speeding down the adjacent highway. When Stephens entered his home he noticed that the back door to the garage was damaged and his alarm system was activated. Stephens immediately called the police. After walking through the home with police officers, Stephens reported a number of items as stolen including a locked steel box containing three handguns, a basket containing pieces of jewelry, and an antique door key. Stephens's wife later discovered that a jewelry box containing several pieces of her jewelry was also missing from the home.

Stephens reported the green SUV's license plate number to officers who discovered that the vehicle was registered to Nicholasville resident Sarah Workman. Upon arriving at Workman's house, a standoff ensued between members of the police department's Special Response Team and Workman's boyfriend, Joseph "Jody" Wilson. Six hours later, Wilson surrendered to officers as they entered the home. Wilson was later identified by Stephens from a photo array as the driver of the green SUV seen fleeing the crime scene. The stolen items were never found.

The subsequent investigation connected Wilson and his friend Teddy Kidwell to the burglary. Kidwell testified at trial that he and Wilson were performing work on Wilson's car on the morning of August 31 when Wilson asked Kidwell to get in his SUV. Kidwell complied, although he de-

nied knowing where Wilson intended to take him. According to Kidwell, Wilson drove to a house at the end of a long gravel driveway, exited the vehicle, and informed Kidwell that he would be back in a few minutes after he "collected some money." Approximately four minutes later, Wilson returned with a dark bag which he placed in the back of the SUV. Kidwell testified that the bag made a "changing" sound as it was deposited in the vehicle.

Wilson was charged with one count of first-degree burglary, three counts of theft by unlawful taking of a firearm, and one count of theft by unlawful taking of property having a value of $500.00 or more. He was also charged with being a persistent felony offender ("PFO") in the first degree. A Jessamine County jury found Wilson guilty of the charged offenses and recommended a sentence of ten years enhanced to twenty-five years for the first-degree burglary charge, and two years enhanced to ten years for each of the four theft by unlawful taking charges. The jury further recommended that the sentences be served concurrently, and the trial court sentenced Wilson accordingly to twenty-five years in prison. Because the erroneous admission of detailed evidence regarding three domestic violence petitions filed against Wilson requires reversal of the convictions, we begin with that issue.

## ANALYSIS

### I. The Trial Court Abused its Discretion in Allowing Admission of Detailed Evidence of Wilson's Past Domestic Violence.

Wilson spent much of the day of the burglary at the Short Street residence where he resided with Sarah Workman and her three children. The Commonwealth called Workman as a witness, established she was Wilson's fiancée, and

then inquired about the events of August 31. Workman testified that she was having a yard sale that day and that Wilson was at home "some of the day" but that there were periods when he was not there. Teddy Kidwell had come to work on their vehicles and at some point he assisted Wilson in delivering a large Power Wheel-type toy which a woman purchased but could not take home in her own vehicle. Workman testified that the two men delivered the toy in the red Camaro and, further, that Teddy took her green, two-tone Ford Explorer for a test drive at some point in the afternoon. Workman also testified that the two men left together in the Explorer around 3:00 to go to Arby's. She was adamant that there was a lot of activity with the yard sale that lasted from 9:00 until 5:00, people "coming and going," and that she would not necessarily know if and when Wilson or Kidwell left, although she remembered the specific instances to which she had testified. After this very limited testimony, none of which exculpated Wilson and none of which was alleged to be inconsistent with anything Workman had previously told police, the prosecutor asked Workman if she was lying. She denied lying then or previously, insisting she was truthful. He then asked if Workman was afraid of Wilson, to which she replied that she had been in the past but was not currently. Over defense counsel's strenuous objection, the trial court then allowed the Commonwealth to read large portions of three domestic violence petitions Workman had filed against Wilson in May 2010, September 2011 and November 2011.

The prosecutor recited Workman's allegations from a domestic violence complaint wherein Workman reported that Wilson "pushed me down, caused my head to hit the floor really hard, broke the phone so I couldn't call it," gave her bruises on her

arms and legs, injured her eye and "said it would take a second to snap my neck." Workman acknowledged the foregoing allegations and the prosecutor continued on with her statement that Wilson is "very controlling, I'm afraid of what he will do to me, I fear for my life, I want him to stay away." After Workman reiterated that she was not afraid of Wilson at the present time, the prosecutor continued his "examination" by reading from an emergency protective order: "Were you afraid of him on May 19, 2010? When he threw you up against the wall, put his hands around your throat? ... 'He started hitting me again, and called me a 'rat' and a snitch. He told me if the police were called, and he got arrested, he would have his friends take care of us.' I can only assume he's talking about you and your eleven year old daughter. Are you scared of him now?"

According to the Commonwealth, the reading from the domestic violence petitions and emergency protective orders was intended to challenge Workman's credibility as a witness. Wilson counters that the evidence was introduced not simply to establish that Workman's testimony was influenced by her fear of him, but to paint Wilson as violent and capable of criminal acts. Having viewed the testimony, we must conclude that Wilson's characterization is accurate.[1]

As is often noted, the determination of witness credibility is the jury's responsibility. *Tuttle v. Perry*, 82 S.W.3d 920 (Ky.2002). To that end, KRE 104(e) permits a party "to introduce before the jury evidence relevant to weight or credibility, including evidence of bias, interest, or prejudice." This Court has held that because witness credibility is "always at issue ... relevant evidence which affects credibility should not be excluded." *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky.1997). And, of course, our rules expressly allow a party to impeach the credibility of that party's own witness. KRE 607. Fear can affect a witness's testimony and, thus, if a witness has reason to fear someone about whom the witness is testifying, evidence of that fear is admissible for impeachment purposes. *Pace v. Commonwealth*, 636 S.W.2d 887 (Ky.1982), *overruled on other grounds by Commonwealth v. Harrell*, 3 S.W.3d 349 (Ky.1999). *See also* Robert Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK § 4.10[2][e]. The witness's fear may well stem from the individual's prior bad acts, implicating KRE 404(b), but as we have recently recognized impeachment is a purpose other than propensity to engage in misconduct which can render collateral "bad acts" evidence relevant. *Trover v. Estate of Judith Burton*, 423 S.W.3d 165 (Ky.2014).

---

1. The majority of the Commonwealth's examination of Workman focused on presenting the three domestic violence incidents, the playing of a profanity-laden telephone call which Wilson had with Workman the night before her testimony and questioning whether Workman was herself lying or accusing other witnesses of lying. Although we need not address these latter two issues, which may not recur on remand, we are compelled to observe that if the recorded conversation of Wilson's phone call from jail is admitted on retrial, the trial judge should allow only those portions which are relevant under Kentucky Rule of Evidence

(KRE) 401 and which are not unduly prejudicial under KRE 403. As for the prosecutor's repeated queries regarding whether Workman was accusing various deputies or Brian Stephens of lying, we trust that the longstanding rule that a witness not be asked to characterize another witness as a "liar" or his testimony as "lies" will be respected on remand. *See Howard v. Commonwealth*, 227 Ky. 142, 12 S.W.2d 324 (1928) (improper to ask witness if various other witnesses were lying); *Moss v. Commonwealth*, 949 S.W.2d 579 (Ky.1997) (same); *Duncan v. Commonwealth*, 322 S.W.3d 81 (Ky.2010) (same).

Nevertheless, evidence otherwise relevant under KRE 401 may be excluded if its probative value is substantially outweighed by the risk of undue prejudice. KRE 403. *See Bell v. Commonwealth*, 875 S.W.2d 882, 888–891 (Ky.1994) (evidence of prior bad acts pursuant to KRE 404(b) should be excluded even if relevant and probative if its probative value is substantially outweighed by its prejudicial effect.). Undue prejudice is most often found when there is a risk that the evidence "might produce a decision grounded in emotion rather than reason" or where the evidence "might be used for an improper purpose." Kentucky Evidence Law at § 2.15[3][b]. *See, e.g., Purcell v. Commonwealth*, 149 S.W.3d 382, 400 (Ky.2004) (although prior acts of sexual voyeurism were relevant and probative, evidence should have been excluded because of its devastating effect: it encouraged conviction because of "what [defendant] was, rather than what he did on the occasion of the charged offense."); *Brown v. Commonwealth*, 313 S.W.3d 577, 618 (Ky.2010) (evidence is unduly prejudicial if it will induce the jury to decide a case based on an emotional response rather than the evidence presented.). A trial court's decision with respect to the relevancy and admissibility of evidence under KRE 401 and 403 is reviewed for an abuse of discretion. *Love v. Commonwealth*, 55 S.W.3d 816 (Ky.2001).

 Even though Workman's limited testimony neither inculpated nor exculpated Wilson, some evidence of the prior domestic violence between the two was relevant to prove that Workman had reason to fear Wilson and that that fear could affect her testimony. We note that the prosecutor asked on more than one occasion if Workman feared Wilson and she consistently replied that she had feared him in the past, but no longer did. The introduction of the domestic violence evidence established precisely what Workman testified to—that there were times in her past when she was afraid of Wilson. Despite Workman's profession that she was no longer fearful of the man against whom she had sought domestic violence protection on three occasions in the preceding twenty months, it is apparent that that fear could recur and still be a factor, whether consciously or not, affecting Workman's testimony. Given that premise, it was not an abuse of discretion to allow the jury to hear some limited evidence on this issue, but the probative value of the detailed evidence actually admitted was clearly outweighed by its extremely prejudicial nature.

The jury heard evidence that Wilson had on one occasion choked Workman and pushed her to the ground, causing her head to strike the floor and injuring her arms, legs, and eye, had threatened to "snap" her neck and on a different occasion threw her against a wall and punched her "all over her body." The jury also heard Wilson's alleged threats to have his friends "take care of" Workman and her young daughter if "the police were called and he got arrested" (for some unknown offense predating the break-in of the Stephenses' home.) Workman's having admitted to being fearful of Wilson in the past, this breadth of detail regarding Wilson's alleged domestic violence went well beyond information truly relevant to Workman's credibility and instead cast Wilson as a despicable person capable of horrific acts of violence. While that may have been an accurate portrayal of the defendant, a man with an extensive criminal history, it was improper under KRE 403. The detailed evidence was calculated to provoke the jury's emotions, while having marginally significant probative value as to the issue for which it was ostensibly offered—Workman's credibility in fully recounting Wilson's whereabouts and actions

on the day the Stephenses' home was burglarized.

■ In sum, the disclosure of the narrative portions of the domestic violence petitions went far beyond simply impeaching Workman's credibility by showing her fear of Wilson, becoming instead an expose of Wilson's extensive domestic misconduct. Although the probative value of this evidence was limited, its prejudicial effect was significant, the domestic violence being even more reprehensible than the property crimes for which Wilson stood trial. The trial court's decision to allow admission of the Commonwealth's detailed domestic violence evidence was an abuse of discretion which requires reversal. On remand evidence relevant to Workman's fear of Wilson is certainly admissible but its probative value must be weighed against the risk of undue prejudice. Because this matter is being remanded to the trial court, we address two issues of law which are pertinent to any further proceedings.

## II. The Separate Theft Convictions Violated Wilson's Double Jeopardy Rights.

■ Wilson contends that his convictions on three separate counts of theft by unlawful taking of a firearm violated the Double Jeopardy provisions of the federal and state constitutions, as well as Kentucky Revised Statute (KRS) 505.020.[2] The Fifth Amendment of the United States Constitution guarantees that no person shall "be subject for the same offence [sic] to be twice put in jeopardy of life or limb[.]" U.S. Const. Amend. V. The same protection is provided under Section 13 of the Kentucky Constitution. *See Commonwealth v. Burge*, 947 S.W.2d 805 (Ky.1996). Wilson argues that all three handguns were taken in one single transaction, not in three separate thefts, rendering his multiple convictions improper. Although Wilson failed to preserve this challenge before the trial court, "the constitutional protection against double jeopardy is not waived by failing to object at the trial level." *Walden v. Commonwealth*, 805 S.W.2d 102, 105 (Ky.1991) (*overruled on other grounds by Commonwealth v. Burge*, 947 S.W.2d at 805). In any event, given our reversal and remand of this case, it is appropriate to address whether Wilson's constitutional right to be free from Double Jeopardy is implicated by the multiple counts.

A person is guilty of theft by unlawful taking when he "takes or exercises control over movable property of another with intent to deprive him thereof." KRS 514.030(1)(a). The crime is elevated to a Class D felony under certain circumstances including if a firearm is taken, KRS 514.030(2)(a), or if the property is valued at $500.00 or more but less than $10,000.00, KRS 514.030(2)(d). In this case, the jury was instructed on three counts of theft by unlawful taking of a firearm, with the instructions describing each of the three handguns,[3] and one count of theft by unlawful taking of property valued at $500.00 or more. The property

---

**2.** KRS 505.020 is a statutory double jeopardy provision prohibiting the prosecution of multiple offenses under several scenarios involving the commission of a single offense.

**3.** Count 2 of the indictment pertained to a Para Ordinance pistol; Count 3 pertained to a Smith & Wesson pistol; and Count 4 pertained to a Derringer pistol. The trial court gave three separate instructions as to each firearm count: a theft as a principal instruction, a complicity to theft instruction and a principal or accomplice to theft instruction. The jury was unable to determine whether Wilson was the principal or accomplice in the theft of the guns and thus convicted him under the third option, principal or accomplice, on each of the three counts.

valued at $500.00 or more was not separately described but the proof on this count focused on the missing jewelry.

As noted, the Commonwealth presented evidence, primarily from Brian Stephens and Teddy Kidwell, that Wilson committed a single theft of three handguns and other personal property from the Stephenses' home in one transaction. This Court has repeatedly held that the taking of multiple items from one residence or location in one transaction constitutes only one theft. Recently, in *Ordway v. Commonwealth*, 352 S.W.3d 584, 593 (Ky.2011), we held the taking of two all-terrain vehicles from a retail establishment at the same time constituted one theft, requiring the vacating of one of the defendant's two theft convictions. *Ordway* was premised on a Double Jeopardy violation as alleged by Wilson in this case. However, Kentucky case law addressing this issue has not always been couched in constitutional terms.

In *Fair v. Commonwealth*, 652 S.W.2d 864 (Ky.1983), this Court addressed multiple theft charges against a defendant who stole three items one night from an automobile dealership. Two of the items, a Chrysler New Yorker and a stereo set, belonged to the dealership but the third item, a shotgun, belonged to the Commonwealth of Kentucky, having been stored in the trunk of a Kentucky State Police cruiser which was in the garage for repairs. Despite the separate ownership of the property, this Court held only one theft occurred. The *Fair* court noted the longstanding position in Kentucky on the theft of multiple items from one location by quoting from "the fountainhead of Kentucky case law on this issue," *Nichols v. Commonwealth*, 78 Ky. 180, 181–82 (1879):

> Larceny is an offense against the public, and the offense is the same whether the property stolen belongs to one person or to several jointly, or to several persons,

each owning distinct parcels. If the flock of sheep of which A owns five, B five, and C five be feloniously asported by one and the same act, there are three trespasses but only one larceny. Each proprietor of a portion of the stolen sheep has sustained a civil injury, and may, indeed must, sue separately for the wrong suffered by him; but the public has sustained but one wrong, and cannot maintain more than one prosecution, . . . .

Acknowledging that over a century later Fair was being prosecuted under the Penal Code rather than common law, the Court noted that the commentary to KRS 514.030 states that it "is intended to include all statutory and common law offenses involving unlawful appropriation of property." Having concluded that the *Nichols* rationale is "firmly established" law that survives the adoption of the Penal Code, the *Fair* Court found "the only question remaining is whether the items stolen in this case were stolen at 'the same time and place.'" 652 S.W.2d at 867. Because the three items were stolen from the automobile dealership at the same time, only one theft conviction could stand. *See also Jackson v. Commonwealth*, 670 S.W.2d 828 (Ky.1984), *overruled on other grounds by Cooley v. Commonwealth*, 821 S.W.2d 90 (Ky.1991) (theft of a radio scanner and guns from the same residence at the same time did not constitute two thefts; expressly recognizing Double Jeopardy violation on appeal despite the defendant's failure to raise the issue in the trial court).

Applying well-established Kentucky law regarding the theft of multiple items at the same time from the same place, we agree that Wilson's convictions on three separate charges of "theft by unlawful taking of a firearm" arising from a single transaction placed him in jeopardy more than once for

the same offense. Although Wilson did not raise the Double Jeopardy issue as to the fourth theft count regarding property valued at over $500.00, it is apparent that the same rationale would likewise preclude basing a separate theft charge on the other property taken at the same time from the Stephenses' home. While the Commonwealth suggests that the General Assembly has seen fit to distinguish theft of firearms from theft of other forms of property, KRS 514.030 creates only one criminal offense, theft by unlawful taking. The separate references in subsection (2) to thefts of firearms and thefts of other forms of property valued at over $500.00 are necessary to identify those circumstances in which a theft charge is elevated to a Class D felony as opposed to being a Class A misdemeanor, the classification applicable to theft of property having a lesser value or property which is not a firearm. On remand, Wilson is properly subject to only one charge of theft by unlawful taking for the single criminal taking of property from the Stephenses' home.

### III. The Evidence Was Not Sufficient to Support the First–Degree Burglary Conviction.

█ Wilson moved for a directed verdict on the first-degree burglary charge, maintaining there was no evidence that he was "armed ... with a deadly weapon" during the invasion of the Stephenses' home. The question of whether a burglar who takes possession of a locked steel box containing handguns can be deemed "armed with a deadly weapon" for purposes of our burglary statute is a matter of first impression for this Court, and given that it will be germane to the proceedings on remand, the issue merits our attention.

The first-degree burglary statute, KRS 511.020, provides, in pertinent part:

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

The relevant portions of KRS 500.080(4)(b) define a "deadly weapon" as "[a]ny weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged." Wilson argues that he was entitled to a directed verdict on the first-degree burglary charge because the Commonwealth failed to prove that he was armed with a deadly weapon at the time of the commission of the crime. In denying the directed verdict motion, the trial court concluded that "possession" of the locked steel box equated with possession of the firearms contained in the box, rendering the first-degree burglary statute applicable.

There was no evidence put forth at trial to suggest that Wilson arrived at the Stephenses' home armed with a deadly weapon so the first-degree burglary charge was premised on Wilson's taking the locked steel box containing three handguns and ammunition. Doubtless the handguns met the statutory definition of "deadly weapons," as the evidence submitted at trial established that they were capable of causing death or serious injury. *Johnson v. Commonwealth*, 327 S.W.3d 501, 507 (Ky. 2010). However, the operative word in the

statute on these rather unusual facts is the word "armed."

A person may become "armed with a deadly weapon" for the purposes of first-degree burglary when he enters a building or dwelling unarmed and subsequently steals a firearm therein. *Hayes v. Commonwealth,* 698 S.W.2d 827, 830 (Ky.1985). The statute does not require that the Commonwealth prove that a gun thus taken during the course of a burglary is "ready for use" in order to sustain a conviction. *Id.* at 830. However, the Commonwealth is required to prove that the defendant is "armed" with the weapon. In *Hayes,* the Court posed a hypothetical scenario similar to the facts presented in the case at bar, where a burglar takes a container without knowing that guns are held therein. 698 S.W.2d at 830. The Court dismissed the hypothetical, stating that "the evidence [actually presented] is sufficient to conclude that the appellant left with the weapons knowingly in his possession and thus became armed during the course of the burglary." *Id.* (internal quotations omitted).

The reference to "knowing possession" in *Hayes* is perhaps misplaced because, as noted by the Commonwealth, the "knowing" element of KRS 511.020 refers to entry into the building and not to the possession of the deadly weapon. However, "armed" is generally understood to mean "equipped with weapons" RIVERSIDE WEBSTER'S II NEW COLLEGE DICTIONARY 61 (1995) and it stretches that concept too far to suggest that an individual who has a locked steel box with no key is "armed" or "equipped with" the guns contained therein. Indeed, the weapons would only be accessible when the box was pried opened or when another key was made for the lock. The Commonwealth's proof established that Wilson was inside the Stephenses' residence a very brief period of

time, only four minutes according to Teddy Kidwell. There is no credible argument or inference that Wilson accessed the guns and thus was armed with a deadly weapon for purposes of first-degree burglary while in or exiting the home. On remand, Wilson is subject to a second-degree burglary charge but not prosecution for first-degree burglary on the facts as presented on appeal.

### *CONCLUSION*

For the reasons stated herein, we reverse the judgment and sentence of the Jessamine Circuit Court and remand for further proceedings consistent with this Opinion.

All sitting. All concur.