RENDERED: SEPTEMBER 28, 2017
TO BE PUBLISHED

Supreme Court of Kentucky

**FINAL**

2015-SC-000655-MR

**DATE** 10/19/17 Kim Redmon, DC

LONNIE CONYERS                                                    APPELLANT

ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.          HONORABLE JULIE REINHARDT WARD, JUDGE
NO. 15-CR-00296

COMMONWEALTH OF KENTUCKY                                          APPELLEE

AND

2015-SC-000687-MR

ROY EDWARD TUCKER                                                 APPELLANT

ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.          HONORABLE JULIE REINHARDT WARD, JUDGE
NO. 15-CR-00295

COMMONWEALTH OF KENTUCKY                                          APPELLEE

AND

2016-SC-000340-MR

JOSEPH HARDY                                                      APPELLANT

ON APPEAL FROM CAMPBELL CIRCUIT COURT
V.          HONORABLE JULIE REINHARDT WARD, JUDGE
NO. 15-CR-00294

COMMONWEALTH OF KENTUCKY                                          APPELLEE

**OPINION OF THE COURT BY JUSTICE HUGHES**

**AFFIRMING**

Following a joint jury trial, Lonnie Conyers, Roy Tucker, and Joseph

Hardy were all found guilty of two counts of first-degree burglary. Each

defendant was sentenced as a first-degree persistent felony offender (PFO) to concurrent, twenty-year terms of imprisonment, and each has now appealed to this Court as a matter of right. Because of the large degree of overlap in the factual background and in the legal issues raised, we have consolidated the appeals for disposition in this single opinion. All three defendants contend that, in light of juror and witness misconduct during the recess following the trial's first day, the trial court should have declared a mistrial. Each defendant also insists that the trial court erred by refusing to dismiss the first-degree burglary charges and by failing to give a jury instruction on receiving stolen property as a lesser, alternative offense to burglary. In addition, Hardy claims that he was entitled to a jury instruction on the defense of voluntary intoxication, while Conyers seeks resentencing on the ground that he was improperly found to be a PFO in the first degree. Convinced that none of the alleged errors gives the defendants, either jointly or singly, a right to relief, we affirm all three judgments.

## RELEVANT FACTS

During the morning of February 11, 2015, in Melbourne, Kentucky, two residences about one-half mile apart were burglarized. The proof at trial, construed favorably to the Commonwealth, showed the following.

Brothers Stan and Brian Turpen, the owners/occupants of one of the homes, testified that they left for work early that morning after having locked the doors. When Stan returned that afternoon, he found one of his guitar cases lying in the driveway and signs of what appeared to be a forced entry.

2

His home was in shambles with drawers and cupboards opened, their contents strewn over countertops and on floors, mattresses removed from the beds and closets ransacked. Stan confirmed that photographs introduced by the Commonwealth accurately showed the state of his home that afternoon. After his initial look around, Stan called both his brother and 911.

Officer Robert Diamond of the Campbell County Police Department responded to the 911 call. Earlier that day he had participated in the arrest of three persons suspected of another burglary in the area, and after talking with Stan Turpen and walking through the residence, he thought it likely that the same persons were responsible for the scene he found there.

The Turpens' missing property list included a wide-screen television, a Fender guitar, and several other household items and five handguns, at least two of which (the two from the brothers' bedside tables) were loaded and ready to fire. The list also included two long guns (a Remington shotgun and a Winchester rifle) and a starter's pistol—a blank gun—that looked like a .22 caliber revolver. Also missing was ammunition for several of the weapons.

Earlier that day, a 911 caller had reported what he believed to be a burglary in progress. George Crawford testified that at about 10:30 that morning he was looking out his kitchen window toward the rear of his property. His residence borders on a pasture, Crawford testified, across which he could see the garage side of the residence of Joe and Brittany Vance.[1]

---

[1]At that time Crawford had not yet spoken to Joe and believed that Brittany's name was Tiffany.

3

Crawford testified that his attention was attracted to the Vances' driveway by a dark-colored, sedan-type car he had never seen there before. Three men appeared to have gotten out of the car, and one of the men had apparently gone up the steps to the front door. Although Crawford was suspicious, he was about to dismiss his suspicions in light of the fact that one of the men could be Joe Vance. Before he could turn away, however, he saw one of the men walk toward the "pedestrian" door of the garage and kick the door open. All three men then disappeared inside the garage. At that point Crawford called 911.

On the 911 recording, after Crawford relayed what he had observed, the dispatcher asked Crawford for a more detailed description of the vehicle. As Crawford tried to comply with that request, it occurred to him that a Nikon camera with a 300mm zoom lens that he used for bird-watching was sitting on his kitchen table. While using the camera, Crawford exclaimed to the 911 dispatcher that one of the men had just come out of the house and appeared to have put something in the backseat of the car. At that point, Crawford started taking pictures.

At trial, the Commonwealth was able to introduce about two dozen photographs—authenticated by Crawford—of the burglary as it happened, of the vehicle and of the three men as they came and went carrying things from the house to the vehicle. After a few minutes, Crawford told the dispatcher that all three men had exited the house, one of them putting what looked like a white pillowcase filled with something into the backseat. In the closing portion of the call, Crawford narrated for the dispatcher the burglars' short-lived get-

4

away: their entering the car; the car's descent down the sloped driveway to Kohls Road; the car's right turn in the direction of Ten-Mile Road; and the almost immediate appearance of a police cruiser right behind the car.

When Crawford's direct examination resumed after the 911 recording, he reiterated that he saw all three persons enter the Vances' residence and later come out carrying items which they placed in the car. During the various cross-examinations, Crawford admitted that he could not see clearly enough, either with or without his camera, to identify any of the persons he saw or to say what items they brought from the house. In particular, he admitted that he saw no one with a gun. He also admitted that while there are photos showing two of the men (in the enlarged photos introduced by the Commonwealth two persons clearly resembling Hardy and Conyers) carrying items from the house, the photo of the third man (strongly resembling Tucker) does not make it clear that he is carrying any property. During redirect examination, however, Crawford explained that during the episode he was juggling the phone and his camera and was not able to photograph everything he saw. Crawford testified emphatically, however, that notwithstanding the lack of a clear photograph of the third man removing property from the home, he witnessed all three men do so.

The Commonwealth's case included testimony from the officers who stopped the suspects' car moments after it left the Vances' driveway. They stopped it as it approached the intersection of Kohls Road and Ten-Mile Road and arrested its three occupants: Hardy the driver, Tucker in the front

5

passenger seat, and Conyers behind him in the backseat. On Hardy's person the arresting officer found eight prescription pills, slightly more than $1,200 in cash, a silver money clip engraved "Vance," a gold chain necklace, and a silver pocket knife. From Tucker the arresting officer took a pocket knife, about $570 in cash, a gold chain necklace, headphones, part of a wall cell phone charger, and an ID card. Conyers was carrying a wallet with his ID card and a cell phone. One of the officers explained that they did not go directly to the Vances' house, but waited for the suspects to leave, because it was safer to approach a defined set of suspects all contained in a car than an indeterminate set spread throughout a residence.

The detective who searched the defendants' car the next morning pursuant to a warrant testified that he and an assisting officer photographed the various items seized during the search. They included a starter's pistol, later identified by the Turpens as theirs, which was found under the driver's seat near the back, and a 9mm Ruger handgun, loaded with a live round of ammunition in the chamber and a full clip, which was found under the front passenger seat. The Vances identified that gun as belonging to Brittany. Brittany testified that she kept it in her jewelry case, which was found, among other items later identified by the Vances, in a white pillowcase in the car's backseat.

The Vances also testified regarding photographs taken by one of the investigating officers depicting their home in shambles shortly after the burglary. The Turpens and the Vances all testified that items found in the

defendants' possession had been taken from their respective homes. The items identified included jewelry, the silver "Vance" money clip, a TV, a guitar, handguns, long guns, ammunition, a jewelry box, a purse, a hammer, savings bonds, an electric drill, and a set of exercise weights.

The Commonwealth's proof included some additional evidence, but the first-degree burglary charges rested primarily on the evidence summarized above. Notwithstanding the obviously sufficient evidence of burglary, the defendants all maintain the trial court erred by including first-degree burglary charges in the jury instructions. We begin our analysis with this contention.

## ANALYSIS

### I. The Trial Court Did Not Err by Refusing to Dismiss the Charge of Burglary in The First Degree.

Burglary, the basic offense, is a crime against real property—an unlawful intrusion thereon. Because such intrusions pose risks to persons on the premises, the basic offense is punished more-or-less severely depending on the presence or absence of circumstances which increase or decrease those risks. *Litton v. Commonwealth,* 597 S.W.2d 616 (Ky. 1980) (discussing the 1978 amendments to the burglary statutes); *Colwell v. Commonwealth,* 37 S.W.3d 721 (Ky. 2000) (discussing the interrelationship of the burglary and trespass offenses). Kentucky Revised Statute (KRS) 511.040 outlaws the basic offense— burglary in the third degree—as follows: "A person is guilty of burglary in the third degree when, with intent to commit a crime, he knowingly enters or remains unlawfully in a building." KRS 511.040(1). A "building," for the purposes of the burglary statutes, is a building in its ordinary sense plus "any

7

structure, vehicle, watercraft or aircraft: (a) Where any person lives, or (b) Where people assemble for [various] purposes. . . ." KRS 511.010(1). Third-degree burglary is a Class D felony. KRS 511.040(2).

The risks posed by the intrusion increase if the building involved is a dwelling—"a building which is usually occupied by a person lodging therein." KRS 511.010(2). Accordingly, a person is guilty of burglary in the second degree, a Class C felony, "when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a dwelling." KRS 511.030(1).

Burglary in the first degree, a Class B felony, occurs if, in the course of the intrusion, the intruder actually injures someone (a non-participant in the crime), or if, as relevant here, he "[i]s armed with explosives or a deadly weapon." KRS 511.020(1). "Deadly weapon" means, in pertinent part, "[a]ny weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged[.]" KRS 500.080(4)(b).

Finally, as relevant to this case, KRS 502.020, the complicity statute, provides in pertinent part that:

A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:

. . . .

(b) Aids, counsels, or attempts to aid such person in planning or committing the offense[.]

KRS 502.020(1)(b). The Commonwealth's theory of the case was that the three defendants all participated as principals in the burglaries of both residences,

8

and were also complicit in the burglaries, with each defendant being guilty, by complicity, of the offense committed by any of them.

Because the buildings involved in this case were clearly dwellings, the jury instructions for each defendant included two second-degree burglary instructions (Vance and Turpen residences), and the defendants raise no objections to those instructions. Because both sets of victims reported the loss of at least one firearm and the police found weapons corresponding to those reports in the car occupied by the defendants at the time of their arrests, the instructions for each defendant also included provisions such as the following for each residence:

> You will find the defendant . . . guilty of First Degree Burglary under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
> A. That in this County, on or about February 11, 2015, and before the finding of the indictment herein, the Defendant . . . either entered or was in complicity with [either of the others] to their entry of the building owned by the Vances [the Turpens] and without the permission of the [owners] or any other person authorized to give such permission; AND
> B. That in so doing, he knew that they did not have such permission; AND
> C. That it was the Defendant's intention that either the Defendant or [either of the others] would commit a crime therein; AND
> D. That when effecting entry or while in the building or in immediate flight there from, the Defendant or [either of the others] was armed with a deadly weapon.

The defendants all objected at trial and continue to object to the giving of this instruction on a number of grounds. Each insists that there was no evidence that he was armed, that he was armed with a deadly weapon, or that he knew or intended that either of the other two men was armed. Implicitly, at least, the defendants concede that their complaint on all of these points is not

9

really with the trial court, which only applied existing law, but rather with prior decisions of this Court. Two of those decisions they ask us expressly to reconsider.

### A. There Was Evidence That the Defendants Were Armed During Both Burglaries.

We begin, however, with the defendants' invocation of *Wilson v. Commonwealth*, 438 S.W.3d 345 (Ky. 2014), in support of their contentions that the Commonwealth failed to prove that they were "armed," for first-degree burglary purposes, because it failed to show "access" to any of the stolen firearms. In *Wilson*, this Court qualified the general rule that "[a] person may become 'armed with a deadly weapon' for the purposes of first-degree burglary when he enters a building or dwelling unarmed and subsequently steals a firearm therein." 438 S.W.3d at 354 (quoting *Hayes v. Commonwealth*, 698 S.W.2d 827, 830 (Ky. 1985)). *See also Riley v. Commonwealth*, 91 S.W.3d 560, 563 (Ky. 2002) ("[o]ne who steals a deadly weapon during the course of a burglary is armed within the meaning of KRS 511.020."). That rule applies, we held in *Wilson*, where the thief has access to the deadly weapon, but not to the theft of a locked fire safe containing a handgun, since the thief, in the four or five minutes it took to complete the burglary and leave the scene, had no remotely realistic chance of gaining access to the gun and using it as a weapon.

The defendants would have us apply *Wilson's* narrow exception to this case, where the Turpens' guns were ultimately found in the trunk and Brittany

10

Vance's 9mm Ruger was found under the front passenger seat.[2] Clearly the exception we noted in *Wilson* does not apply here, where one or more of the defendants had the guns in hand at some point inside the residences or in the car while leaving the residences, and where the defendants had ready access to the car's trunk and to the area beneath the seat.

## B. There Was Evidence That the Defendants Were Armed With a Deadly Weapon.

The defendants also contend that because there was insufficient evidence that any of the guns was operable, none of the guns could reasonably be deemed a "deadly weapon." They suggest that, in addition to proof that the gun was loaded, the Commonwealth should be required to prove either that the gun was actually fired during the burglary or that ballistics evidence establishes that it could have been fired.

The defendants acknowledge that we rejected this contention in *Wilburn v. Commonwealth*, 312 S.W.3d 321 (Ky. 2010), where a plurality of the Court deemed the statutory definition satisfied if the particular weapon was one of a class of weapons from which a shot readily capable of causing death or serious physical injury could be discharged. Under *Wilburn*, Brittany Vance's Ruger and all of the Turpens' guns (excluding the starter's pistol) could reasonably be deemed "deadly weapons." The defendants acknowledge this and acknowledge

---

[2] We agree with the defendants' assertion that the Turpens' starter's pistol, which was found under the driver's seat, was not a deadly weapon under KRS 500.080, since a starter's pistol is not a type of weapon from which a shot may be discharged.

11

further that we applied *Wilburn* in *Johnson v. Commonwealth,* 327 S.W.3d 501 (Ky. 2010), but they ask us to revisit this precedent and reconsider Justice Noble's *Wilburn* dissent, which construes KRS 500.080(4) in a manner similar to what they advocate.

In *Wilburn,* the Court considered the pre-Penal Code understanding of "deadly weapon" in the burglary context and compared that meaning to the current statutory definition of the term. Two members of the Court read the statute as not affecting the prior law, which provided, in effect, that a deadly weapon was anything a burglar passed off as a deadly weapon, whether an actual weapon or not. The three-member plurality agreed with Justice Noble to the extent that it understood the statutory definition as precluding objects, such as sticks or fingers in pockets, merely passed off as weapons. However, the plurality rejected the proposition that first-degree burglary prosecutions should hinge on the savviness of burglars, who could easily defeat prosecution under the dissent's approach merely by discarding the weapon after the crime (so its operability could never be determined) or by disabling it. The Court's reasoned consideration in *Wilburn* is not yet even eight years old, and we will not revisit the question here.

**C. There Was Sufficient Evidence of the Defendants' Complicity.**

We also decline the defendants' invitation to reconsider our construction of the complicity statute, KRS 502.020. Section (1) of that statute, the section

12

applicable in this case, provides, with respect to crimes outlawing certain acts,[3] that one person may be found guilty "of *an offense* committed by another person when, with the intention of promoting or facilitating the commission of *the offense,* he" in any of various ways lends support or assistance to the principal offender. KRS 502.020(1) (emphasis supplied). The defendants insist that an alleged complicitor cannot be found guilty of the *aggravated offense* of another (*e.g.,* burglary in the first degree) unless he intended to promote or facilitate the aggravated offense, *i.e.,* unless he knew that the principal offender he was aiding was armed with a deadly weapon.

Arguably, the evidence in this case—a trunk full of guns and a loaded Ruger handgun in the passenger compartment—could reasonably be thought to satisfy even the defendants' take on the statute, but we need not make that assessment because, as the defendants acknowledge and as we noted in *Smith v. Commonwealth,* 370 S.W.3d 871 (Ky. 2012), the law in Kentucky has always been otherwise. The *mens rea* for complicity, we have held, is that the complicitor intend the principal's commission of the basic offense. If he does so and in addition aids or encourages the principal's act (as could certainly be found in this case with respect to all of the defendants) then he exposes himself to liability for whatever degree of the offense the principal actually commits. *See Smith,* 370 S.W.3d at 877-78 (citing post-Penal Code cases to this effect).

---

[3] As opposed to crimes that outlaw certain results—those crimes are addressed in section (2) of the complicity statute. *See Smith v. Commonwealth,* 370 S.W.3d 871 (Ky. 2012) (discussing the distinction).

13

The Commentary to the Penal Code supports that construction by noting that these provisions of the Code were not intended to change existing law and by emphasizing that under section (1) of the complicity statute, the complicitor's mental state must be the "intent to promote or facilitate the commission of an offense," not necessarily the particular degree of the offense actually committed. *Kentucky Penal Code, Final Draft*, p. 30 (Nov. 1971).

As we observed in *Smith*, the defendants' contention that imputing to them as complicitors an aggravated offense without proof that they knew the principal was engaged in aggravated conduct somehow runs afoul of *Jackson v. Virginia*, 443 U.S. 307 (1979) (holding that the government must prove all the elements of a crime beyond a reasonable doubt), is simply wrong. As just discussed, the elements of complicity do not simply track the elements of the principal offense. We reject, in short, the defendants' proposed reconstruction of the complicity statute.

### D. There Was Sufficient Circumstantial Evidence That the Defendants Participated in the Turpen Burglary.

Finally, we reject the defendants' contentions that the lack of witnesses and the lack of forensic evidence connecting any of the defendants to the Turpens' residence precludes a finding that any of them participated in that burglary. On the contrary,

> The possession of stolen property is prima facie evidence of guilt of theft of the property. Where there is a breaking and entering and property taken from a dwelling and the property is found in possession of the accused, such showing makes a submissible case for the jury on a charge of burglary.

14

*Riley v. Commonwealth,* 91 S.W.3d 560, 563 (Ky. 2002) (quoting *Jackson v. Commonwealth,* 670 S.W.2d 828, 830 (Ky. 1984)). *See* KRS 500.080(14) (defining "possession," for Penal Code purposes as either actual or constructive possession); and *see Houston v. Commonwealth,* 975 S.W.2d 925 (Ky. 1998) (recognizing the applicability of "constructive possession" to guns as well as illegal drugs).

The inference that the defendants who possessed the Turpens' property burglarized their residence is strengthened in this case by the defendants' commission of very similar crimes at the Vance residence a short time after the Turpen burglary, as witnessed by Mr. Crawford. The trial court did not err for this or for any of the other reasons discussed above when it instructed the jury as to first-degree burglary for the Vance and Turpen residences.

## II. The Trial Court Did Not Err by Refusing to Instruct on Receiving Stolen Property.

No more availing are the defendants' claims that the trial court erred by denying their requests for jury instructions on the "lesser" offense of receiving stolen property as a defense to the charge of first-degree burglary. They insist the trial court violated its duty to provide instructions on the whole law of the case, including requested instructions on any lawful defense.

None of the defendants testified but, through counsel, they suggested the possible involvement of someone other than the defendants, apparently hoping to induce the jury to doubt that all of the defendants were equally involved in the offenses and therefore perhaps acquit or convict one or more of them of a less serious offense. To allow for those "fourth man" arguments, the trial

15

court, in addition to the first-degree burglary by complicity instructions noted above, also gave instructions for all the defendants with respect to the Turpen burglary on facilitation to first-degree burglary, on second-degree burglary by complicity, and on facilitation to second-degree burglary.

With respect to the Vance burglary, Tucker, who did not appear in any of Crawford's photographs with property in his hands, was given the same four instructions. Conyers and Hardy were given first- and second-degree burglary by complicity instructions, but the court denied their requests for facilitation instructions since, in the court's view, Crawford's photos of them actually carrying property out of the Vances' home precluded a finding that either of them merely facilitated that crime.

Aside from their already-discussed objections to the first-degree burglary instructions, the defendants do not complain about the instructions the court gave. They complain, rather, that the court erred by refusing to give additional instructions at least with respect to the Turpen burglary on the "lesser" offense of receiving stolen property. Where, as here, such a claim has been properly preserved, *Martin v. Commonwealth,* 409 S.W.3d 340 (Ky. 2013), and where the trial court's decision is based on its assessment of the evidence, we review that claim for an abuse of discretion. *Sargent v. Shaffer,* 467 S.W.3d 198, 203 (Ky. 2015). In this context as in others, however, where the issue is purely a matter of law, our standard of review is *de novo. Sargent,* 467 S.W.3d at 204.

The receiving stolen property statute, KRS 514.110, provides in its first section that a person is guilty of that offense

16

when he receives, retains, or disposes of movable property of another knowing that it has been stolen, or having reason to believe that it has been stolen, unless the property is received, retained, or disposed of with intent to restore it to the owner.

The basic offense is a Class A misdemeanor, but if the property received includes a firearm or is worth more than $500 but less than $10,000, then the offense is enhanced to a Class D felony. KRS 514.110(2)(3).

The trial court decided against a "receiving stolen property" instruction with respect to both burglaries not because the evidence did not support it, but rather because, in the court's view, receiving stolen property is not an *included* offense of burglary and so, at least in this case, was not an available *lesser* offense. The defendants contend that the trial court thus erred. We disagree.

Although not technically a "defense" under the Penal Code, a lesser-included offense is "in fact and principle, a defense against the higher charge." *Hudson v. Commonwealth*, 202 S.W.3d 17, 20 (Ky. 2006) (quoting *Slaven v. Commonwealth*, 962 S.W.2d 845, 856 (Ky. 1997)). In Kentucky, "KRS 505.020(2) establishes whether a charge is a lesser-included offense." *Id.* (citing *Perry v. Commonwealth*, 839 S.W.2d 268 (Ky. 1992)). Under that statute, as pertinent here,

[a] defendant may be convicted of an offense that is included in any offense with which he is formally charged. An offense is so included when:
(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]

As the trial court correctly observed, thus defined, receiving stolen property is not an "included" offense of burglary. Receiving stolen property

17

requires proof of the retention or disposition of property with the knowledge that the property has been stolen. Burglary requires an unlawful intrusion upon real property with an intent to commit a crime. In terms of their elements, therefore, the two crimes are utterly distinct. To establish burglary in this case, moreover, it was not necessary for the Commonwealth to show that the defendants also received stolen property. While their retention of stolen property was certainly part of the evidence allowing an inference of criminal intent, to show that the defendants entered the two residences with the intent to commit crimes the evidence of theft, the evidence that the residences were ransacked, or the evidence that convicted felons stole guns could also have sufficed. As the Court noted in *Hudson,* "the fact that the evidence would support a guilty verdict on a lesser uncharged offense does not entitle a defendant to an instruction on that offense." 202 S.W.3d at 21. The trial court correctly so ruled.

Arguing against that ruling the defendants refer us to *Hall v. Commonwealth,* 337 S.W.3d 595 (Ky. 2011), and to *Perry v. Commonwealth, supra.* Those cases involved prosecutions for attempted murder where the defendant had shot and injured a victim, but had not killed him. In both, an issue developed at trial concerning the defendant's intent at the time of the shooting—to injure or to kill—and in both, at the close of proof the Commonwealth was granted an instruction on assault as a "lesser-included offense" of attempted murder.

18

Notwithstanding the seemingly obvious tension with KRS 505.020, in both cases this Court upheld the "lesser-included" instruction. Doing so in *Hall*, we declined to overrule *Perry* and instead reiterated its view that KRS 505.020(2) does not require a "strict statutory elements" approach to lesser-included offenses, but rather allows for "instructions on uncharged offenses where the facts alleged in the indictment or the evidence presented at trial support[] such instructions." 337 S.W.3d at 606.

The defendants contend that the trial court ignored this teaching from *Hall* and subjected their requests for a receiving stolen property instruction to a "strict statutory elements" test. We disagree. As noted above, the Commonwealth's proof of burglary in this case did not necessarily entail proof of receiving stolen property. Without attempting to explicate the possible relationship between *Hall* and *Hudson*, moreover, we note the trial court's observation that nothing, *i.e.,* none of the double jeopardy provisions of KRS 505.020, precluded convicting the defendants of receiving stolen property as well as burglary. That possibility makes this case more like *Hudson*, where conviction of both the charged offense and the proposed lesser offense was possible, 202 S.W.3d at 21, than *Hall*, where conviction of both assault and attempted murder would run afoul of KRS 505.020(1)(b), which prohibits conviction of more than one offense when the separate offenses require inconsistent findings of fact. *See Kiper v. Commonwealth*, 399 S.W.3d 736 (Ky. 2012). Assault in the latter situation can, perhaps, like an elements-based lesser-included offense, be thought a "defense" to a charge of attempted

19

murder, whereas receiving stolen property in this case does not have the same significance. In sum, *Hudson* is the more apt analog to this case, and the trial court did not violate *Hall*.

Finally, it is also worth reiterating that the trial court gave the jury appropriate lesser-offense options—especially with respect to the Turpen burglary—but nevertheless the jury convicted the defendants of first-degree burglaries. The defendants' suggestion that the trial court's refusal to instruct on receiving stolen property somehow coerced the jury to find them guilty of a more serious crime than it would have done had it been given their requested instruction is thus belied by the record.

## III. Juror and Witness Misconduct Did Not Necessitate a Mistrial.

### A. The Juror "Misconduct" Was Not Prejudicial.

The defendants also contend that the trial court erred by denying their joint motion for a mistrial. That motion was premised on a flurry of juror and witness misconduct that occurred during the evening recess following the first day of trial. All of that misconduct involved witness George Crawford, the neighbor who saw and photographed the break-in at the Vances' residence.

Crawford was the Commonwealth's second witness and the last witness at the end of the trial's first day, most of which was devoted to jury selection and opening statements. Very soon after Crawford's testimony concluded, the trial court admonished the jury members not to discuss the case among themselves or with anyone else and dismissed them for the night. As it happened, about half of the jury rode down on the courthouse elevator at the

same time Crawford did. Another person on the elevator—a venire member who had not been selected to hear the case but who had remained in the courtroom as a spectator—complimented Crawford on his testimony and asked him for additional details about the location of the Vances' house and the intersection near where the defendants had been stopped. Crawford answered the question, admitted having been nervous during his examination, and wondered whether anyone else had found the air in the courtroom very dry. A juror who had suffered a nosebleed during the day's proceedings replied that his nose had, a remark that drew laughs from some of the other jurors. At that point, the elevator ride ended, and the jurors and Crawford went their separate ways.

That evening the Commonwealth learned of Crawford's encounter with some of the jurors, and the next morning, before the trial resumed, it informed the court. One-by-one the court examined the jury members to determine which of them had been on the elevator with Crawford and what, exactly, had been said. The scenario sketched above emerged from their answers. Crawford was also recalled and questioned; and even the spectator who asked Crawford to elaborate on the location of the arrest was identified and called in to be questioned by the court and examined by the parties.

The court concluded that, while unfortunate, Crawford's elevator encounter with jury members had been inadvertent, had not borne on any of the contested issues in the case, and did not in any other way threaten to taint the jury's deliberations or decisions. Beyond an admonishment to the jurors

21

who had ridden on the elevator with Crawford to say nothing about the encounter to others, the court concluded that the elevator incident did not entitle the defendants to any relief, and in particular did not necessitate a mistrial.

The defendants maintain that the trial court's ruling ignores the important rights at stake: the right to a fair trial, generally, under the Due Process Clauses of both our state and the federal constitutions, and more particularly, the constitutional rights to an unbiased jury, *Remmer v. United States*, 347 U.S. 227 (1954), and to a jury whose verdict is based solely on the evidence received in open court. *Sheppard v. Maxwell*, 384 U.S. 333 (1966). A juror's exposure to either outside influences—bribes and threats are the classic examples—or extrinsic information threatens those rights and, upon a proper showing, obligates the trial court to inquire and to "ascertain whether the juror was or was not tainted." *United States v. Davis*, 15 F.3d 1393, 1412 (7th Cir. 1994) (discussing the showing that will trigger the trial court's duty to inquire); *Commonwealth v. Abnee*, 375 S.W.3d 49, 55 (Ky. 2012) (same, and holding that "an unauthenticated and unsworn letter from a lone juror, without more, is insufficient to trigger the process for further inquiry"); *Smith v. Phillips*, 455 U.S. 209, 215 (1982) (noting that, "This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.").

Upon inquiry, "[i]f there is a 'reasonable possibility' that a jury's verdict has been [or will be] affected by material not properly admitted as evidence, the

22

criminal defendant is entitled to a new trial." *Davis,* 15 F.3d at 1412 (citation omitted). In other words, juror misconduct entitles a defendant to a new trial (or a mistrial) only if there is sufficient evidence to establish both the misconduct and resulting prejudice. "Prejudice is shown whenever there is a reasonable probability or likelihood that the juror misconduct affected the verdict." *Meyer v. State,* 80 P.3d 447, 455 (Nev. 2003) (discussing the different approaches to the "prejudice" question adopted by the federal Courts of Appeal).

Not every incidence of juror misconduct requires a mistrial. Rather, "[e]ach case turns on its own facts, and on the degree and pervasiveness of the prejudicial influence possibly resulting." *Meyer,* 80 P.3d at 453 (quoting *United States v. Paneras,* 222 F.3d 406, 411 (7th Cir. 2000)). As the Supreme Court stated in *Smith,*

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case.

455 U.S. at 217 (footnote omitted).

In Kentucky these fundamental rights receive protection under both KRS 29A.310 and Rule of Criminal Procedure (RCr) 9.70. Among other things, the

23

statute forbids witnesses (without leave of court) from "convers[ing] with the jury or any member thereof upon any subject after they [the jury members] have been sworn." KRS 29A.310(2). The statute also provides that if the jury is permitted to separate prior to deliberation, the court shall admonish the jury [members] that "it is their duty not to converse with, nor allow themselves to be addressed by, any other person on any subject of the trial[.]" KRS 29A.310(1). RCr 9.70 provides for the same admonition; requires the court to give it, or at least to refer to it, "at each adjournment"; and further requires that the jury members be admonished to report immediately to the court any attempts to communicate with them.

Under these provisions, we have held, improper conversations between third parties (including witnesses) and jurors must be assessed for their potential to prejudice the defendant: "The true test is whether the [third-party/juror] misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Graham v. Commonwealth*, 319 S.W.3d 331, 339 (Ky. 2010) (quoting *Talbott v. Commonwealth*, 968 S.W.2d 76, 86 (Ky. 1998)).

At one extreme, in *Dalby v. Cook*, 434 S.W.2d 35 (Ky. 1968), our predecessor Court presumed prejudice where, during the trial, a juror conversed with an interested third-party (the secretary of one side's attorney) and expressed agreement with that person's views as to what the outcome of the case should be. At the other extreme, in *Owings v. Webb's Ex'r*, 304 Ky. 748, 202 S.W.2d 410 (1947), our predecessor found presumptively non-prejudicial brief conversations during a recess between the court clerk and two

24

jurors, one of whom wondered "where in the community a corn shredder was then operating," and the other "where they [the jury] would eat lunch that day." "We have several times held," the Court explained, "that no reversible error was committed when some person innocently conversed with a juror on a matter foreign to the trial." 202 S.W.2d at 412 (citation omitted). *See also Talbott, supra* (deeming harmless similarly "innocent," "non-substantive" conversations between a sheriff/witness and three jurors).

In between the extremes it becomes the duty of the trial court to inquire as to the breach of the statute or the rule and to determine, if it appears that misconduct occurred, whether there is a reasonable likelihood that it did (or would) affect the fairness of the trial. *Cf. Smith v. Phillips, supra* (prescribing, in the due-process context, a hearing for colorable allegations of juror misconduct and an opportunity for the complaining party to show prejudice); *see also Oro-Jimenez v. Commonwealth,* 412 S.W.3d 174, 180-81 (Ky. 2013) (approving, under KRS 29A.310, this manner of proceeding and upholding the trial court's decision after the hearing to the effect that brief, consolatory remarks by a juror to one of the victim/witnesses during the recess between the trial's guilt and penalty phases did not necessitate a mistrial).

Here, of course, having been presented with the Commonwealth's own concerns about potentially serious juror/witness misconduct, the trial court promptly and thoroughly inquired into what happened and determined, correctly in our view, that the innocuous elevator encounter posed virtually no risk of prejudicing the defendants' trials. The trial court proceeded exactly as it

25

should have done, and its decision not to declare a mistrial amounted to an appropriate exercise of its discretion.

Arguing to the contrary, the defendants correctly note that Crawford's elevator comments about his nervousness while testifying, about the courtroom's dryness, and especially about the location of the Vances' house and where the defendants were stopped, were not completely "innocent," like the third-party remarks in *Owings* and *Talbott,* in the sense of being completely unrelated to the trial. The defendants' conclusion, however, that because this case is not at the "innocent" extreme it must be at the opposite, "presumptively prejudicial" extreme goes too far. As observed in our more recent cases, such as *Graham* and *Oro-Jimenez,* between the presumptive extremes there is a middle ground where the trial court must inquire and consider. That is precisely where the elevator incident in this case lies.

No more persuasive are the defendants' claims of prejudice arising from that incident. Briefly, they contend that the comment by the courtroom spectator complimenting Crawford's testimony and Crawford's "I was scared," and "Did anyone else find the courtroom dry?" comments enabled Crawford to establish rapport and sympathy with the jurors on the elevator, and thus were apt to affect those jurors' assessments of Crawford's credibility. Had the facts been different and Crawford's credibility crucial to the Commonwealth's case, this claim might merit more comment. As it was, however, the defendants were essentially caught red-handed, and Crawford's testimony was cumulative, supported by, among other things, the 911 recording, by Crawford's

26

photographs, and by the evidence obtained by the police from the defendants' car and identified by the victims. In these circumstances, the trial court correctly determined that the risk of prejudice from Crawford's brief and merely polite elevator remarks was essentially nil.

A final facet of the defendants' prejudice argument focuses on their so-called "fourth man" theory. Through cross-examination of Crawford, the defendants established that he could not see through the tinted windows of the car he observed in the Vances' driveway and therefore could not rule out the possibility that there was a fourth man in the vehicle. Similarly, there was a brief interval when Crawford lost sight of the vehicle, providing opportunity for a fourth man to jump out after the car left the Vance residence and before the police stopped it. There was absolutely no evidence to support the presence of a "fourth man" and, significantly, the three men depicted in Crawford's photos look like the three defendants. Nevertheless, they contend that Crawford's elevator comments, by establishing rapport with certain jurors, may have somehow undercut their "fourth man" theory. They never articulate how this occurred and instead insist that the possibility of prejudice entitles them to a new trial. As noted, the innocuous conversation here is far less serious than the misconduct in our presumptive prejudice cases and it was therefore the defendants' burden of showing prejudice, *i.e.*, providing an evidentiary basis for finding that it was reasonably possible that the elevator incident would affect the jury's verdict. With no such evidence in the record, the trial court properly denied a mistrial.

27

## B. The Witness Misconduct Was Not Prejudicial, Either by Itself or in Conjunction With the Juror "Misconduct."

Next, the defendants contend that even if the elevator incident was not enough by itself to call into question the fairness of their trial, it was enough when viewed in conjunction with two other gaffes by Crawford that same evening. We disagree.

During Crawford's testimony, the defendants invoked Kentucky Rule of Evidence (KRE) 615, the Exclusion of Witnesses rule. With a few exceptions not applicable here, that rule requires the trial court, upon a party's request, to "order witnesses excluded [from the courtroom] so that they cannot hear the testimony of other witnesses." As we have explained, the letter of this rule applies only to what happens in the courtroom, but its spirit "is violated 'when witnesses coordinate their testimony' outside the courtroom." *Hall*, 337 S.W.3d at 616 (quoting *Woodard v. Commonwealth*, 219 S.W.3d 723 (Ky. 2007), *abrogated on other grounds* by *Commonwealth v. Prater*, 324 S.W.3d 393 (Ky. 2010)). Accordingly, in conjunction with the exclusion of other witnesses from the courtroom, the prosecutor duly advised Crawford not to discuss his testimony later with other witnesses.

However, after testifying, Crawford accepted a ride home from Stan Turpen, one of the brothers whose home was burglarized. Turpen was at the courthouse that afternoon because he too was due to testify for the Commonwealth. The two men conversed on the drive home.

Also, in response to a text message asking how the day had gone, Crawford telephoned Brittany Vance later that evening, and discussed with her

28

in some detail the questions he had been asked and his impressions of the defense. He appears to have noted, in particular, the interest of both sides in whether he observed any of the defendants with a gun. Brittany was scheduled as a prosecution witness.

The defendants objected to these apparent breaches of KRE 615's spirit. The trial court therefore, along with its inquiry into the elevator incident, inquired of, and allowed the parties to examine, Crawford, Brittany Vance, her husband Joe Vance, and Stan Turpen concerning any attempts among them to coordinate their testimonies.

Crawford denied having discussed his testimony with Stan Turpen, whom he had met only that day. Turpen recalled Crawford recounting that he had seen the defendants in the Vances' driveway, but mostly he recalled Crawford's description of a block-watch program in which he had participated while he was a resident of Cincinnati. The trial court, noting that Crawford and Turpen were witnesses of separate events and that there was virtually no overlap between what they had observed, ruled that even if Crawford had mentioned his testimony during the ride home, Crawford's testimony was not apt to have any bearing on Turpen's and thus the rule violation, if any, arising from their conversation was harmless.

With one exception, the trial court ruled similarly with respect to the Vances. The Vances were not home while Crawford was observing the break-in at their house, so their various testimonies overlapped very little: Crawford describing the break-in from the outside as it occurred and the Vances

29

describing the effects of it from the inside after the fact. Given those differences, the trial court concluded that the Vances' testimonies were not apt to be significantly affected by knowledge of Crawford's testimony.

The exception, in the trial court's view, was Crawford's possible "heads up" regarding the significance the parties appeared to place on Brittany's gun. Brittany testified during the *voir dire* that only in the last couple of days had her husband located a document identifying the gun by its serial number and herself as its owner. She intended, she said, to provide that document to the prosecutor. She had also, apparently after talking with Crawford, double checked with her husband to make sure she knew how many bullets the clips for her gun held. The trial court excluded all of this "new" gun evidence as possibly the result of Crawford's tip, but it denied the defendants' request to exclude Brittany's identification of the gun altogether, since she had told the investigating detective it was hers long before Crawford testified.

The trial court also denied motions for mistrial or the exclusion of witnesses on the ground that the trial's fairness had been undermined by the two violations of KRE 615 together with the violations of KRS 29A.310 and the fact that Crawford's testimony appeared tainted by his apparent desire to help out the Vances. Rejecting those claims, the trial court reiterated that in its view the rule and statutory violations, such as they were, were minor and did not threaten to prejudice the defendants or to impair the trial's fairness. It also noted that if they so desired the defendants could recall Crawford and via cross-examination attempt to impeach him as biased. The defendants

30

maintain that, regardless of any actual prejudice, the trial court abused its discretion by failing to remedy the appearance of unfairness arising from so many witness and juror improprieties. We are convinced, however, that the trial court's handling of these matters was appropriate.

Beginning with the asserted violations of KRE 615, we explained in *Woodard* that, although "collusion" among witnesses (whatever their intent) violates the spirit of KRE 615, because it occurs outside the presence of the court, the court's ability to do anything about it is limited: "[T]he most [the trial court] could do is question the witnesses in an effort to ensure a fair trial. The best course is to allow the testimony subject to proper impeachment on cross examination." *Woodard,* 219 S.W.3d at 728-29. The trial court fully complied with that recommendation here.

As it did in the face of likely juror/witness misconduct, the trial court responded to the allegations of out-of-court witness "collusion" by promptly conducting a very thorough inquiry of its own into what happened and by giving the parties full opportunities to explore both what happened and how what happened might affect them. As with the juror "misconduct," it turns out that the witness "collusion" was much more smoke than fire. Stan Turpen learned nothing bearing on his testimony from Crawford. The Vances had nothing they did not already know to learn from each other. And Brittany Vance did not have much to learn from Crawford, either. While Crawford should not have told Brittany what he was asked during his testimony and how

31

he responded, the fact that he did, in the circumstances of this case, was simply not likely to have much impact on Brittany's testimony.

The possible exception, Crawford's observation that both sides wanted to know about Brittany's gun, the trial court defused by disallowing Brittany's testimony in the least bit likely to be responsive to it. That was a remedy well beyond the cross-examination that *Woodard* suggests would have sufficed. In short, the trial court applied KRE 615 to an out-of-court "collusion" situation precisely as *Woodard* envisioned: by inquiring so as to identify possible effects on a fair proceeding, and by responding so as to resolve the problems and keep the proceeding fair.

The defendants insist that that was not enough, that at some point, flame or no flame, smoke itself requires relief. "This trial could not possibly have appeared fair," the defendants complain, to anyone who sat, as they did, "for hours the second day of trial observing a parade of jurors and witnesses admitting to rule violation after rule violation undermining the fairness in their case." On the contrary, what an observer might have seen, and what the record plainly shows, is a trial judge taking pains to determine exactly what had happened outside the courtroom and its effect, if any, on the ongoing trial. The trial court did not err or abuse its discretion in ultimately determining that none of the alleged incidences of juror or witness misconduct, considered singly or cumulatively, necessitated a mistrial. The well-developed record allows us to say with confidence that the defendants "received a fundamentally fair trial with any errors being so minor that even their cumulative effect does

32

not demand reversal." *Hall*, 337 S.W.3d at 616-17 (quoting *Roach v. Commonwealth,* 313 S.W.3d 101, 113 (Ky. 2010)).

## IV. Defendant Hardy Was Not Entitled to an Instruction on Voluntary Intoxication.

Hardy individually claims that he was entitled to a jury instruction on the statutory defense of voluntary intoxication. As he correctly notes, a trial court is required to instruct the jury on affirmative defenses if the evidence would permit a juror reasonably to conclude that the defense exists. *Fredline v. Commonwealth,* 241 S.W.3d 793 (Ky. 2007); *Nichols v. Commonwealth,* 142 S.W.3d 683 (Ky. 2004). On the other hand, such an instruction is to be rejected if the evidence does not warrant it. *Payne v. Commonwealth,* 656 S.W.2d 719 (Ky. 1983). The trial court made the latter determination in this case, and we review that decision for an abuse of discretion. *Sargent v. Shaffer,* 467 S.W.3d at 202-04.

Under KRS 501.080(1), voluntary intoxication is a defense to a criminal charge only if the intoxication "[n]egatives the existence of an element of the offense." As Hardy notes, an intrusion into another's real property that is knowingly wrongful, as well as an intent to commit a crime therein are both elements of burglary that could conceivably be "negatived" by intoxication. *See Weaver v. Commonwealth,* 298 S.W.3d 851, 855 (Ky. 2009) (noting that intoxication is a potential defense to burglary). We have interpreted KRS 501.080(1), however, "to mean that the [voluntary intoxication] defense is justified only where there is evidence reasonably sufficient to prove that the

33

defendant was so [intoxicated] that he did not know what he was doing." *Fredline*, 241 S.W.3d at 797 (quoting *Rogers v. Commonwealth*, 86 S.W.3d 29, 44 (Ky. 2002)). "[M]ere drunkenness," in other words—*i.e.*, the mere impairment of judgment and/or physical control that commonly leads intoxicated persons to do things they would not ordinarily do—"does not equate with the Kentucky Penal Code's definition of the 'defense' of voluntary intoxication." *Nichols*, 142 S.W.3d at 688 (quoting *Rogers*, 86 S.W.3d at 44). The defense requires proof of something "more" than "mere drunkenness." *Id.* Here it is doubtful that the evidence would have permitted a finding that Hardy was intoxicated, much less that he was so intoxicated that he ceased to be aware of what he was doing.

The evidence Hardy relies on was all introduced in conjunction with the evidence of his arrest. Officer Champaign, the arresting officer, testified that the search of Hardy's person incident to the arrest yielded, among other items, eight prescription pills, later identified as five hydrocodone pills and three Xanax pills. Additionally, the search incident to Hardy's arrest was captured by the "dash cam" video camera of one of the police cars. Hardy's counsel played that video for the jury, and maintained that it shows Hardy moving slowly, as though under the influence of pills at the time of the arrest.

The officer testified, however, that Hardy was the driver of the defendants' car and that his driving had not appeared impaired. According to the officer, Hardy was the first defendant ordered out of the car, and he exited without stumbling or showing any other sign of intoxication. His eyes were not

34

glassy. The "dash cam" video, as the officer noted, shows Hardy cooperating with the search and, despite having his hands cuffed behind his back, obeying without any loss of balance or other difficulty such commands as turning around and raising each of his feet as the officer removed Hardy's shoes and searched his socks. The officer testified at no point during Hardy's arrest did he suspect that Hardy might be intoxicated. The "dash cam" video in no way belies that testimony.

Defense counsel asked the officer if he was aware that while waiting to be booked into the Campbell County Detention Center Hardy had wet his pants. Unfortunately, on the trial video the officer's response, yea or nay, is not clear, but in any event defense counsel thereafter referred to Hardy's purported accident as further evidence of intoxication.

Could a reasonable juror infer from the foregoing evidence that at the time of either crime Hardy was so intoxicated that he was not aware of what he was doing? The trial court properly concluded "no." Even if the evidence permitted an inference that Hardy had ingested pills prior to the crimes, the evidence, much like the evidence of pre-crime cocaine and alcohol use in *Stanford v. Commonwealth,* 793 S.W.2d 112 (Ky. 1990), also showed that Hardy could drive, walk, and understand what was said to him. Hardy was apparently aware of his actions and appeared to be functioning normally.

On the other hand, there was no evidence, as there was in *Nichols v. Commonwealth, supra,* that Hardy was wild or out of control, nor was there evidence, as there was in *Lloyd v. State,* 587 S.E.2d 372 (Ga. App. 2003), the

35

other case upon which Hardy relies, that he was acting strangely and was so intoxicated immediately after the crime as to pass out and urinate on himself. In sum, none of the evidence suggested that Hardy was so intoxicated that he was unaware of what he did. Accordingly, the trial court did not abuse its discretion when it decided that Hardy was not entitled to an intoxication instruction.

## V. The Trial Court Did Not Err During the PFO Proceedings by Refusing to Exclude Evidence of One of Conyers's Prior Felonies.

Finally, Conyers contends that he was improperly sentenced. The jury initially sentenced him to serve fifteen years in prison on each first-degree burglary count, with those sentences to be served concurrently. In light of proof that Conyers had two prior felony convictions, the jury then found him subject to sentencing as a PFO in the first degree and recommended the two concurrent sentences be enhanced to twenty years. The trial court sentenced Conyers accordingly.

On appeal, Conyers contends, as he did in the trial court, that due to a change in the law one of his prior felonies should no longer count for PFO purposes. He maintains that he is entitled to be resentenced at a new penalty phase from which evidence of the "lapsed" felony is excluded.

In 2004 Conyers pled guilty to trafficking in less than eight ounces of marijuana. At the time of the offense (and still today), first-offense trafficking in less than eight ounces of marijuana was a Class A misdemeanor. KRS 214A.1421 (1992). However, because Conyers did his peddling within 1000 yards of a school, the offense was enhanced under KRS 214A.1411 (1992) to a

36

Class D felony.[4]  Conyers, only nineteen at the time of his 2004 guilty plea, was sentenced to five years but that sentence was probated.

Some seven years later, in June 2011, the General Assembly amended KRS 214A.1411 so as to shrink the enhancement zone around schools.  Under the amended statute, misdemeanor trafficking offenses do not become felonies unless they take place within "one thousand (1000) *feet*," not yards, of a classroom.  KRS 214A.1411(1) (2011) (emphasis added).  Conyers claims (a point the Commonwealth does not contest for the purposes of this case) that his 2004 offense did not take place within 1000 feet of a classroom and so would not have been a felony under the 2011 version of the statute.

From that fact, Conyers argues that his 2004 felony conviction should be deemed, retroactively, a misdemeanor for PFO purposes in this case.  The trial court rejected that argument, and so do we.  KRS 532.080, the PFO sentencing statute, does not require proof that prior felonies would still be felonies under current law.  As pertinent here, it requires only a prior conviction (or prior convictions) "of a felony in this state."  KRS 532.080(2) and (3) (defining second and first-degree PFO status, respectively).  In 2004, Conyers pled guilty to "a felony in this state," and the resulting conviction remains a felony conviction

---

[4] The statute provided in pertinent part as follows: "Any person who unlawfully traffics in a controlled substance classified in Schedules I, II, III, IV or V, or a controlled substance analogue in any building used primarily for classroom instruction in a school or on any premises located within one thousand (1,000) yards of any school building used primarily for classroom instruction shall be guilty of a Class D felony, unless a more severe penalty is set forth in this chapter, in which case the higher penalty shall apply."  Marijuana is classified as a Schedule I controlled substance.  KRS 218A.050(3).

for PFO purposes notwithstanding the subsequent amendment of KRS 214A.1411.

Against this conclusion Conyers refers us to KRS 446.110, which, among other things, addresses "Offenses committed . . . prior to repeal of law." In pertinent part, the statute provides: "No new law shall be construed to repeal a former law as to any offense committed against a former law." This, of course, is contrary to Conyers' contention, which is that the 2011 amendment of KRS 218A.1411 *did* repeal the earlier version applicable to Conyers in 2004. This provision of the statute is consistent with the general rule, as stated in KRS 446.080(3), that "[n]o statute shall be construed to be retroactive, unless expressly so declared." Unless the General Assembly says so, in other words, new statutes, such as the 2011 amendment to KRS 218A.1411, do not apply to offenses committed prior to their enactment. However, Conyers points us to an exception to the presumption against retroactivity: "If any penalty, forfeiture or punishment is mitigated by any provision of the new law, such provision may, by the consent of the party affected, be applied to *any judgment pronounced after the new law takes effect.*" KRS 446.110 (emphasis added). Even assuming that the 2011 amendment to KRS 446.110 addressed the penalty, and not the substance of the law, *see Rodgers v. Commonwealth,* 285 S.W.3d 740, 750 (Ky. 2009) (discussing that distinction), the problem with Conyers' reliance on this exception is that the judgment to which he wants to apply the new, "penalty-mitigating" version of the statute—his 2004 trafficking conviction—was pronounced some seven years *before* the new law took effect.

38

The KRS 446.110 exception, by its own terms, does not apply in this situation. *Rogers v. Commonwealth,* 366 S.W.3d 446, 456 (Ky. 2012) (noting that "by the statute's [KRS 446.110] plain terms the retroactivity is limited to changes that take effect prior to the 'pronouncement' of judgment.").

Conyers' unsupported constitutional arguments fare no better. He contends that he was found to be a first-degree PFO upon proof of only one prior felony, in violation of the Due Process Clause of the federal constitution. He also contends that the judicial branch's use of a crime that the legislature has determined should not be a felony to enhance his sentence as a prior felony offender is a violation of the separation of powers doctrine.

As discussed above, the General Assembly has made crystal clear its intent that unless it clearly says otherwise, even the penalty provisions of new laws have only a limited retroactive reach. The General Assembly did not except the 2011 amendment from those limits, and Conyers' 2004 conviction lies far outside them. The real due-process and separation of powers violations would occur were we to follow the course urged by Conyers and give the 2011 amendment of KRS 218A.1411 a retroactive effect far in excess of what the General Assembly has indicated it should have. In short, the trial court did not err by allowing use of Conyers' 2004 felony marijuana-trafficking conviction in the PFO portion of this case.

## CONCLUSION

For the foregoing reasons, we reject the three defendants' shared appellate arguments, as well as the individual arguments raised by Hardy and

39

Conyers. Accordingly, we hereby affirm the Campbell Circuit Court's judgments convicting and sentencing each defendant.

All sitting. All concur.


COUNSEL FOR APPELLANT, LONNIE CONYERS:

Emily Holt Rhorer
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Jeffrey Ray Prather
Assistant Attorney General


COUNSEL FOR APPELLANT, ROY EDWARD TUCKER:

Susan Jackson Balliet
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph Todd Henning
Assistant Attorney General

COUNSEL FOR APPELLANT, JOSEPH HARDY:

Erin Hoffman Yang
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Joseph Todd Henning
Assistant Attorney General