RENDERED:  MARCH 26, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1027-MR

RYAN PARLETT                                 APPELLANT

v.              APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHLEEN LAPE, JUDGE
ACTION NO. 18-CR-01409

COMMONWEALTH OF KENTUCKY                 APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; K. THOMPSON AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Ryan Parlett appeals as a matter of right from the Kenton Circuit Court's judgment and sentence following a jury trial based on trial court error and prosecutorial misconduct.  Parlett argues he should have been granted a jury instruction on voluntary intoxication and received a directed verdict

on arson. He also argues there was unpreserved prosecutorial misconduct in the Commonwealth's closing argument regarding misstatements as to intent.

On the morning of August 19, 2018, police were called to investigate a burglary in progress at an abandoned house. They found Parlett inside on the stairs and ordered him to exit the building which he did.

A fire had started upstairs in the loft area. The fire department was called, and the fire was quickly extinguished.

The interaction between Parlett and the police was captured on both officers' body cameras. In this footage, Parlett can be heard indicating he left a cigarette upstairs; it was catching fire; asking to go put out the fire and then repeatedly asking for the fire department to be called; and finally exclaiming that the fire department needed to be contacted before "the f***ing building burns down."

On October 25, 2018, Parlett was indicted for second-degree arson and third-degree burglary. Parlett proceeded to a jury trial which began on April 9, 2019. Parlett's defense was that he was so drunk he did not understand what he was doing, his dropped cigarette must have accidentally caused the fire, and he tried to tell the police about the fire so that it could be put out. Although Parlett claimed he did not remember what happened, he denied intentionally setting the fire.

At the close of the Commonwealth's case in chief and again at the close of the case, Parlett moved for a directed verdict on the arson charge, arguing there was no proof he set fire to the rubbish in the loft area with intent to damage the building. His requests were denied. Parlett requested a jury instruction on voluntary intoxication, which was also denied.

On April 11, 2019, the jury found Parlett guilty of second-degree arson and guilty of third-degree burglary. The jury recommended the minimum sentences, ten years for second-degree arson and one year for third-degree burglary, to be served concurrently. On June 3, 2019, Parlett was sentenced in accordance with the jury's recommendation to a total of ten years of incarceration.

Parlett argues the trial court erred in denying him a jury instruction on voluntary intoxication where it was supported by the evidence. He argues there was ample evidence he was too intoxicated to form the intent needed to commit arson and burglary.

We review the trial court's decision as to whether the jury should be instructed on the defense of voluntary intoxication for abuse of discretion. *Conyers v. Commonwealth*, 530 S.W.3d 413, 431 (Ky. 2017). "[A] trial court is required to instruct the jury on affirmative defenses if the evidence would permit a juror reasonably to conclude that the defense exists" but "such an instruction is to be rejected if the evidence does not warrant it." *Id.*

Voluntary intoxication is only a defense to a criminal charge if the intoxication "[n]egatives the existence of an element of the offense[.]" KRS 501.080(1). Second-degree arson and third-degree burglary both require specific intent that can be negated by voluntary intoxication. *See Brafman v. Commonwealth*, 612 S.W.3d 850, 858 (Ky. 2020) (regarding second-degree arson); *Callison v. Commonwealth*, 706 S.W.2d 434, 436 (Ky.App. 1986) (regarding burglary in general as applied to third-degree burglary).

Intoxication can only function as a defense to a specific intent crime if it "completely negate[s] the element of intent;" that is, the degree of intoxication must rise to the level of "equat[ing] with insanity." *McGuire v. Commonwealth*, 885 S.W.2d 931, 934 (Ky. 1994). "If, from the evidence presented, a jury could reasonably conclude that the defendant was so intoxicated that he could not have formed the requisite mens rea for the offense, a voluntary intoxication instruction is warranted." *Fredline v. Commonwealth*, 241 S.W.3d 793, 797 (Ky. 2007). "The defense requires proof of something 'more' than 'mere drunkenness.'" *Conyers*, 530 S.W.3d at 432 (quoting *Nichols v. Commonwealth,* 142 S.W.3d 683, 688 (Ky. 2004)). "[A] more advanced drunkenness" must be established to justify the instruction. *Luna v. Commonwealth*, 460 S.W.3d 851, 882-83 (Ky. 2015). The defendant must be unaware of his or her conduct or "blackout" drunk. *Compare*

*Mishler v. Commonwealth*, 556 S.W.2d 676, 680 (Ky. 1977), *with Luna*, 460 S.W.3d at 882-83.

Parlett's testimony establishes that he became intoxicated to the point of being "blackout drunk." Parlett testified that after getting off work at 1:30 a.m. he had a couple of beers at a bar and then went home and drank a whole bottle of bourbon (either a fifth or a liter), took three or four Benadryl for his allergies and stayed up all night watching television. He recalled that things "got fuzzy." Parlett testified that while he remembered going outside to smoke when it was getting light outside, things were "getting blurry," and he had no recollection at all of approaching the house or what he did inside. He testified the next thing he remembered was seeing a lot of officers pointing weapons at him. Parlett testified he did not know why he went into the abandoned house as he had never taken note of it before, and he did not know what his thought processes could have been.

However, this is not the end of our inquiry. In the recent case of *Brafman*, 612 S.W.3d at 857-59, the Kentucky Supreme Court considered whether a defendant's self-serving claim of being unaware of her actions due to intoxication required corroboration before the trial court was obligated to give a voluntary intoxication instruction. The Court reviewed two cases in detail, *Mishler*, 556 S.W.2d at 678-80, and *Bratcher v. Commonwealth*, No. 2019-SC-000135-MR, 2020 WL 2091864, *1-*4 (Ky. Apr. 30, 2020) (unpublished). The

Court distinguished *Mishler*, which reversed a trial court's decision not to give a voluntary intoxication instruction where a defendant's narrative testimony regarding a blackout during a robbery was corroborated but "patently implausible[,]" explaining the reversal was on the basis that "state-of-mind issues should generally be given to the jury for deliberation." *Brafman*, 612 S.W.3d at 858.

The Court then reviewed its recent unpublished case of *Bratcher*, where it upheld the trial court's decision not to give the instruction where the defendant testified he was "so blacked out from meth consumption at the relevant time that he 'couldn't remember what city he was in[,]'" but whose testimony was at times inconsistent and was uncorroborated. *Brafman*, 612 S.W.3d at 859. The Court explained that in *Bratcher*, it "refrained from imposing a hardline rule that testimony must always be corroborated to warrant an instruction, but . . . held that it was generally not an abuse of discretion for the trial court to refuse an instruction without more." *Id.* at 859 (footnotes omitted).

While acknowledging that it was not bound by its decision in *Bratcher*, the Court in *Brafman* closely followed its reasoning and established a stronger rule. The Court acknowledged that the defendant's testimony about being awake for five days, ingesting substantial amounts of whiskey, methamphetamine and ecstasy, and being unable to remember anything regarding the crime, *Brafman*,

612 S.W.3d at 856, "would support the finding of a serious enough level of intoxication for a voluntary intoxication defense, warranting an instruction[,]" but noted "[her] testimony was not corroborated[.]" *Id.* at 859. Therefore, it concluded:

> We cannot say that the trial court abused its discretion by refusing to give the instruction for voluntary intoxication, because it was not corroborated by evidence admitted at trial. Accordingly, we are constrained to conclude that the trial court did not abuse its discretion by declining to give the tendered intoxication instruction.

*Id.*

Therefore, we apply *Brafman* in considering whether Parlett produced corroboration of his argument that he was sufficiently intoxicated to negate intent. While Parlett admits that the police officers who arrested him testified there was no indication that he was drunk or intoxicated, he highlights other evidence to establish that there was enough evidence to warrant the instruction. Parlett states that the 911 caller reported on his erratic behavior of chasing a cat and opined he was possibly intoxicated. He argues that the body camera video established he failed to appropriately respond to officers and had difficulty understanding them. He notes that his mother testified that after he was arrested she found his apartment door unlocked, the television on and numerous alcohol bottles inside.

We have reviewed the relevant evidence and do not interpret it as corroborating Parlett's testimony that he was intoxicated, let alone had imbibed to

the level of being unaware of his conduct. None of the eye witnesses observed anything in Parlett's physical conduct or speech to indicate he was intoxicated, including the neighbor who called 911. The neighbor reported that Parlett walked normally and did not stumble or trip. She explained that the only reason she said he might be intoxicated was because the area from which he came had a lot of drug activity, not because of anything she observed in how he moved or acted. Parlett's mother's testimony did not establish how much alcohol he had consumed or when, only that he had access to alcohol.

The police officers testified that Parlett obeyed commands, was coherent and responded appropriately to questions. They did not smell alcohol on him and did not interpret any of his actions as indicating possible intoxication.

We have reviewed the police body camera footage which shows that Parlett responded to commends (albeit not right away), climbed out of the window and walked without any difficulty, when handcuffed with his hands behind his back. Indeed, in repeatedly requesting that the fire department be called, Parlett was acting in a rational manner. While Parlett's speech inflections were a little odd, he spoke very similarly when he testified at trial.

Other than Parlett's testimony, there is no evidence to show he was impaired. Under these circumstances, the trial court did not err in failing to instruct the jury on the defense of voluntary intoxication.

Parlett argues the trial court erred in not granting him a directed verdict of acquittal on the arson charge because the Commonwealth failed to prove he intentionally set the fire with the intent to damage the building or that the building was damaged at all.

In *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991), the Kentucky Supreme Court restated the rule for a directed verdict as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

"To defeat a directed verdict motion, the Commonwealth must only produce 'more than a mere scintilla of evidence.'" *Lackey v. Commonwealth*, 468 S.W.3d 348, 352 (Ky. 2015) (quoting *Benham,* 816 S.W.2d at 187). On appellate review, the test for determining if a directed verdict of acquittal was required is whether under the evidence as a whole, it would clearly be unreasonable for a jury to find the defendant guilty. *Benham*, 816 S.W.2d at 187.

"Intent can be inferred from the actions of an accused and the surrounding circumstances. The jury has wide latitude in inferring intent from the evidence." *Anastasi v. Commonwealth*, 754 S.W.2d 860, 862 (Ky. 1988). "Intent

may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct[.]" *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997).

Parlett was convicted of second-degree arson on the basis that he started "a fire . . . with intent to destroy or damage a building . . . [o]f another[.]" KRS 513.030(1)(a). As explained in the 1974 Kentucky Crime Commission/ Legislative Research Council's Commentary to KRS 513.020, each degree of arson relating to starting a fire requires "an *intentional act* of starting a fire" where "it must be established that the defendant consciously desired to start the fire . . . . This does not mean, of course, that it must be shown for each offense that he desired the consequences of the fire[.]"

Relying on this commentary, the Court in *King v. Commonwealth*, 513 S.W.3d 919, 927 (Ky. 2017), explained:

> The statute requires an intentional act only in the sense
> that the flames, wherever and however they are ignited,
> must have been lit intentionally. . . . The upshot of this is
> that accidentally starting a fire is not a crime. So . . . the
> distracted smoker whose carelessly discarded cigarette
> butt starts a forest fire that burns multiple residences . . .
> [is not a] criminal arsonist[] under our Penal Code.

*In Cardwell v. Commonwealth*, No. 2011-SC-000383-MR, 2012 WL 5878155, *3 (Ky. Nov. 21, 2012) (unpublished),[1] the Kentucky Supreme Court upheld a first-degree arson conviction based upon a fire an inmate set in his cell. The inmate argued he was entitled to a directed verdict because it could not be established that he had the intent to damage or destroy the building where the evidence established he set the fire to try to get the attention of guards, he used no accelerants, the concrete cinderblock walls could not catch fire as they were not a flammable material, and he did not set fire to the mattresses. *Id.* at *2.

The Court explained sufficient evidence was presented to infer the inmate's intent to damage or destroy the building because a nylon bag was used as a wick, a guard observed the inmate feeding the fire paper products, the fire caused damage, and there was testimony that it could have caused further damage if it was not quickly extinguished. The Court sustained the conviction, opining "[t]he damage to the cell was both a logical and probable consequence of [the inmate's] actions." *Id.* at *3.

The jury that convicted Parlett heard testimony from fire department expert witnesses Assistant Chief Chris Kiely and Lieutenant Daniel DeCarlo who testified about their investigation which eliminated all causes of the fire other than

_____

[1] Pursuant to Kentucky Rules of Civil Procedure 76.28(4)(c), we cite to this unpublished opinion as there is no published opinion which adequately addresses these issues.

a deliberate ignition from a movable ignition source. While Parlett's defense was that his cigarette could have accidentally caused the fire, Kiely testified that it was extremely unlikely for safety cigarettes, the type of cigarettes in Parlett's possession when he was arrested, to catch material on fire as 75% of such cigarettes self-extinguish when they are no longer being smoked. Kiely explained that using data from standard cigarettes which do not self-extinguish, there is a less than 1% chance for discarded lit cigarettes to ignite other material. He also explained that when cigarettes do ignite highly combustible material, the average ignition time (how long it takes a smoldering cigarette to heat another material to the point where it can combust and ignite on its own) ranges from fourteen to twenty minutes. Kiely noted that ignition only occurred in this time frame when ideal conditions were maintained where the cigarette is covered and in the most conducive environment to keeping heat in.

Kiely explained that cigarettes that did not self-extinguish could continue to burn for between eleven to twenty minutes at most when not being smoked. Then if the cigarette managed to ignite another material, it would take between five and seven minutes for that material to produce flames which would produce the level of smoke that could be seen from the outside, escaping around the windows of the house. He therefore opined that the timing of when the smoke was observed did not support the fire being ignited by a cigarette.

Other testimony and evidence established the following timeline: the 911 call reporting Parlett breaking into the house occurred at 6:54 a.m.; police arrived at 6:59 and 7:02 a.m.; Parlett came downstairs by 7:03; Parlett climbed out of the window by 7:05 a.m; as recorded by an officer's body camera, someone passing by the house audibly said the "house is on fire" at 7:06 a.m.; flames were visible from the back of the house and black smoke was pouring out of the windows by 7:08 a.m.; and firefighters arrived at 7:14 a.m. and quickly put the fire out. This timeline requires the fire to have started and grown to the level of being visible outside the house within twelve minutes of Parlett breaking into it.

Police testimony established that Parlett had lighters on him when he was arrested, which provided a possible ignition source. When asked if the fire could have ignited within twelve minutes, Kiely explained that the fire could only have ignited that quickly if a lighter was used to ignite the rubbish.

Parlett argued his intent to damage the building could not be established because he informed the police that he left a lit cigarette upstairs and a fire was catching, requested that he be allowed to put it out, and repeatedly requested that the police call the fire department. He argues that these actions supported his defense that the fire was accidental. However, his testimony confirms that ignition took less than twelve minutes to occur, making accidental

-13-

ignition via a discarded cigarette extremely unlikely given Kiely's expert testimony.

Additionally, Parlett's subsequent actions do not necessarily negate any intent on his part to damage or destroy the house at the time the fire was started. It was up to the jury to interpret his actions. Therefore, the jury was entitled to infer that Parlett used his lighter to ignite rubbish with the logical and probable consequence that the building would thereby be damaged by the fire. The jury may have believed that Parlett later regretted his actions and sought to mitigate the damage, which might explain its recommendation of concurrent statutory minimum sentences, while also believing that he acted deliberately in setting the fire with the intent to damage the building.

Parlett also argues he is entitled to a directed verdict because the building was not damaged. He attempts to distinguish between there being a fire to the building and a fire within the building, arguing only the rubbish in the loft area and one spindle caught fire, rather than the building itself.

The commentary to KRS 513.020 explains that for an arson conviction, "damage to a building" must be established. It quotes from the drafters of the New York Penal Law about the purpose of the requirement:

> Under the former Penal Law, arson was defined in terms of "burning a building." To constitute a "burning," courts spoke of the need to show a wasting of the fibers of the wood, no matter how small in extent. The early

> cases were often concerned with whether a charred or scorched condition was sufficient to constitute a "burning." The arson sections, of the Revised Penal Law all speak of "damage" to a building, i.e., an injury that lowers the value of the building or that impairs its usefulness. Thus, the fact question to be faced by the triers in any particular case is whether there was "damage." The crime is complete as soon as there is some damage to the building.

KRS 513.020 (KY. CRIME COMM'N/LRC COMM. (1974) quoting N.Y. PENAL LAW § 150.10 PRACTICE COMMENTARY at 397 (McKinney 1967)).

We interpret the commentary to KRS 513.020 as explaining that the change from requiring a "burning" of a building to "damage" to a building, to have eliminated the requirement that the building itself catch fire. The statute addresses damage generally and does not distinguish between burn damage, heat damage and smoke damage. We do not believe a building must sustain structural damage for the evidence to support an arson conviction.

This interpretation is consistent with the damage sustained to a correctional facility cell in *Cardwell*. There, the cell door sustained heat damage and the cell wall sustained smoke damage. *Cardwell*, 2012 WL 5878155 at *1, *3. While damage in that case was only discussed for purposes of establishing the inmate's intent, we are confident it provides a clear indication that heat and smoke damage are sufficient to establish damage to a building.

-15-

Firefighter DeCarlo testified extensively about the damage which the fire caused to the abandoned building and numerous pictures showing the damage were introduced into evidence. He explained there was damage to the upper story loft area and the rooms on that level which included: smoke staining to the walls and ceiling, heat damage, melted and blistered paint, charring to a door frame, fire damage to the tops of doors, heavy charring, and a burn pattern up by a window, and heavy charring to portions of the baseboards.

Parlett does not accurately summarize the evidence about damage to the building or what must be proven to establish such damage. The evidence was more than sufficient to support the element of damage. While the damage may have been relatively minor because the fire started in a pile of rubbish and was quickly extinguished, the arson statute does not distinguish between levels of damage. A fire that does only minor damage is not treated differently than a fire that completely destroys a building. The jury was authorized to find Parlett guilty of arson because all of the needed elements were established by the evidence.

Parlett argues the Commonwealth misstated the law in its closing argument as it related to intent by stating that Parlett could be convicted of arson, and thus burglary, if he merely intended to start a fire and it caused damage. Parlett argues the Commonwealth's burden was instead to prove that he set the fire with intent to damage the building and his intent cannot be inferred simply because

damage resulted where he explained to police when they arrived that there was a fire upstairs. He argues this unpreserved error in conflating standards of proof constituted prosecutorial misconduct.

Pursuant to Kentucky Rules of Criminal Procedure (RCr) 10.26, we review this argument for palpable error, and can only grant relief "upon a determination that manifest injustice has resulted from the error." Because the error was unpreserved, we can only reverse if any prosecutorial misconduct is "flagrant." *Matheney v. Commonwealth*, 191 S.W.3d 599, 606 (Ky. 2006).

We note that "[g]reat leeway is allowed to *both* counsel in a closing argument. It is just that—*an argument.* A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of a defense position." *Slaughter v. Commonwealth*, 744 S.W.2d 407, 412 (Ky. 1987).

"In considering an allegation of prosecutorial misconduct, the Court must view that allegation in the context of the overall fairness of the trial. To justify reversal, the Commonwealth's misconduct must be 'so serious as to render the entire trial fundamentally unfair.'" *Murphy v. Commonwealth*, 509 S.W.3d 34, 49 (Ky. 2017) (quoting *Soto v. Commonwealth,* 139 S.W.3d 827, 873 (Ky. 2004)).

Reversal is not warranted because there was no misconduct, let alone flagrant misconduct, resulting in manifest injustice. As discussed relative to Parlett's request for a directed verdict, an inference as to his intent could be made

from the evidence and circumstances surrounding the fire. The prosecutor did not commit misconduct by explaining that the jury could infer Parlett's intent to set the fire based on the established timeline of how quickly the fire ignited and how unlikely it was that a discarded lit cigarette could be responsible. There was no error in the prosecutor's explanation that if the jury were to be satisfied Parlett had the intent to set the fire, knowing the damage that was likely to result, this would satisfy the requirements for burglary as it was uncontested that he broke into a house that was not his own and arson could be the crime Parlett intended to commit therein.

Accordingly, we affirm the Kenton Circuit Court's judgment and sentence.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Deanna L. Dennison
Covington, Kentucky

BRIEF FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Stephanie L. McKeehan
Assistant Attorney General
Frankfort, Kentucky